**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICK HAMPTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-5650 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| CITY OF CHICAGO, MICHAEL | ) | |
| DUFFIN, and THOMAS PTAK, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Illinois state law for alleged violations of his civil rights stemming from his 1982 criminal conviction. This matter is before the Court on Defendants' motion for summary judgment [104]. For the reasons explained below, the Court grants in part and denies in part Defendants' motion [104]. The Court enters summary judgment in favor of Defendants and against Plaintiff on Plaintiff's *Monell* claim against the City of Chicago for violation of his right to Due Process (Count I) and on Plaintiff's claims for Failure to Intervene (Count II), Malicious Prosecution (Count IV), Intentional Infliction of Emotional Distress (Count V), Civil Conspiracy (Count VI), and Respondeat Superior (Count VII). Defendants' motion for summary judgment is denied as to Plaintiff's Section 1983 claim against Defendant Duffin for violation of Plaintiff's right to Due Process (Count I), Plaintiff's Section 1983 claim for Conspiracy (Count III), and Plaintiff's claim for Indemnification (Count VIII). This case is set for status hearing on July 26, 2017 at 9:30 a.m.

# I.      Background

The Court takes the relevant facts primarily from the parties' Local Rule 56.1 statements and exhibits thereto, [106], [107], [108], [122], [124], [125], [126], [142], and [148].  In addition, the Court held an oral argument on the summary judgment issues and accepted supplemental briefing [157], [158] on various issues arising out of the briefs and discussed further during the oral argument.  The following facts are undisputed except where otherwise noted.  The parties' evidentiary objections are discussed and ruled upon where relevant throughout this section of the opinion.

## A.      The Events of December 29, 1981

This case begins with events that occurred more than thirty years ago, on December 29, 1981.  At that time, Plaintiff Patrick Hampton ("Plaintiff") was 18 years old and living in Chicago at 4429 South Federal in the Robert Taylor Homes.  Defendants Michael Duffin ("Duffin") and Thomas Ptak ("Ptak")[1] were employed by Defendant the City of Chicago ("City") as Detectives in the Chicago Police Department ("CPD").  They were both assigned to Area 3 violent crimes.

On December 29, 1981, Plaintiff attended the "Holiday Jam" concert at the Chicago International Amphitheater ("Amphitheater").  Denise M. ("Denise"), her then-boyfriend Hugo N. ("Hugo"), his younger sister Martha N. ("Martha"), and her boyfriend Scott S. ("Scott") also attended the concert.  They were seated in the fifth row close to the stage.  During the concert, a large numbers of concertgoers—around 40 or 50 total, and all or mostly African-American men—moved down the aisle toward the stage.  Some of these individuals were chanting or shouting gang slogans and making motions with their hands in support of the "Black Gangster

---

[1] Ptak is now deceased.  Plaintiff has not named Ptak's estate as a defendant.

Disciples" gang. While trying to leave the venue, Denise, Hugo, and Martha were attacked by members of this group and struck with fists, chairs, and other objects.

Denise's clothes were ripped off by the attackers. Men pushed their penises into her face while she was being beaten and held down on the floor. All of her jewelry was ripped from her body and stolen. Hugo was also stripped of his clothing and jewelry, kicked in his back, and punched in his face and all over his body. He was hit with chairs while he attempted to shield Denise from the violence. Martha's hair was pulled and her clothing was partially removed. She described her attackers as hitting her and trying to get her to the ground while tearing off her pants and underwear. Her necklace was stolen and she was knocked unconscious, before regaining consciousness, getting up, and running away.[2] Following the attack, Denise, Hugo, and Martha were taken to Mercy Hospital.

The record includes a medical report that was prepared concerning Martha. See [124-10]. The "history" section reports that Martha stated "she was in ampi. and attacked by unknown [men] and past out [sic] for about 5 minutes, she is not sure if there was sexual assault." [124-10] at 3.

### B.     The Police Investigation

Detectives Duffin and Ptak were assigned to investigate the Amphitheater attacks. Duffin and Ptak went to Mercy Hospital and attempted to interview Denise. They were unable to conduct the interview because Denise was too emotionally upset. They were able to interview Hugo, who had been released from the hospital but was there visiting Denise. According to the police report, Hugo told Duffin and Ptak that he and his girlfriend were jumped by approximately twenty black males who were yelling "Disciples" and "get her." [122-1] at 5.

---

[2] The parties disagree about whether Martha was knocked unconscious for only a moment or for a longer period of time.

Hugo also told the detectives that the black males who jumped him and his girlfriend tore their clothes off their bodies and took their jewelry and money. Hugo further stated that approximately ten of the men had their penises out and were attempting to insert them into his girlfriend's mouth and vagina. In an attempt to prevent the men from doing this, Hugo laid himself on top of Denise to shield her body; however, numerous men were still able to put their hands inside Denise's vagina.

On December 31, 1981, Keith Powell ("Powell"), who at the time was fourteen years old, contacted Officer Praski ("Praski") of the Fifth District with information regarding the incident at the Amphitheater. Praski reported that Powell stated that he was at the concert at the Amphitheater on December 29, 1981 and that the individual responsible for the attack of the girl was Ricky Knight ("Knight"). Knight was a local gang leader in the Black Disciples. Knight was the only individual who Powell identified to Praski.

Praski contacted Duffin and Ptak with the information that Powell had provided. Duffin and Ptak interviewed Powell at the Fifth District. They took him to the Gang Crimes office to review gang photographs. Duffin took notes during the interview with Powell. Duffin subsequently wrote a report regarding his interview with Powell, and destroyed his notes. The report that the detectives prepared following their interview with Powell states:

> "Keith Powell stated in essence but not verbatim the following. He attended the rock concert at the international amphitheater the night of the incident. Further that their [sic] were numerous people in attendance that he knew from his old neighborhood at 44th & Federal. He stated that the people that he knew there were members of the third world black gangster disciple street gang. As the concert was in progress he observed the people he knew from this gang attack a white girl and boy who were watching the concert. He saw them tear the clothes off this couple and observed the couple break loose a short time thereafter and run away. After leaving the consert [sic] he rode the 43rd Street bus east with the people he knew while on the bus he heard them bragging about sticking their penis's [sic] in the girls mouth and putting their hands in her vagina. He also hear [sic] them say that they robbed the couple of their jewelry money and clothing.

He then gave r/d's the names and addresses of these offenders. **He stated that the offenders were Pat Hampton of 4429 S. Federal**, Ezra Garner and his brother Ron Garner of 4429 S. Federal, Ricky knight [sic] of 4410 S. State, Ron Mallory of 4429 S. Federal, Bird of 4500 S. State apt. 909 and Sandel Pool. He went on to relate that the leader of this gang was Rickt [sic] Knight. R/d''s brought Keith Powell into A/1 Gang Suppression unit and showed him photos from the various gang books. He identified the Photo of Ricky Knight as the leader of the gang and one of the offenders."

[125] at 8 (emphasis added).

Following the interview with Powell, Martha and the other victims signed complaints against Plaintiff and swore to the facts alleged in the complaints. Duffin also signed the complaints in the capacity of "Clerk," stating that the complaints were "subscribed to and sworn to before" him. [137] at 20-21. Duffin, Ptak, and other police officers arrested Plaintiff, Ezra Garner ("Ezra"), Robbie Garner ("Robbie"[3]), and Bobby Brooks ("Brooks") at the Robert Taylor Homes. Following those arrests, other suspects, including Knight, Ronald Mallory ("Mallory"), "Bird," and Sandel Pool ("Pool") were still wanted by the CPD.

Ptak and Duffin spoke with Plaintiff following his arrest. The detectives included the following statement about that conversation in their report:

He [Plaintiff] later stated that he was at the Amphitheater during the assault and robberies of the victims. He went onto relate that [he] was sitting in the back of the Concert area when he saw a large group fighting near the stage and then later heard that some people were talking about a girl getting raped. [Plaintiff] went onto relate that he got on an Eastbound CTA bus to go home and while on the bus he overheard a subject by the nickname "Spoon" whose real name is Ronald Mallory state that he had kicked the white broad in her shit. He was asked what Spoon had meant when he said shit and he replied her vagina, he also added that Spoon was talking with Bud, Ezra Garner and Ronnie Garner. He related that Bud is also known as Budline and that he lives at 4429 So. Federal, Apt #1405. Hampton further stated that Spoon kept on bragging about what he did to the white broad and her boyfriend while he was apparently attempting to rape the girl.

[125] at 9-10.

---

[3] Robbie is also erroneously referred to as "Ronnie" is several documents in the record.

Plaintiff denies the accuracy of several aspects of the report. Specifically, Plaintiff denies that he told the detectives that he was "sitting in the back of the Concert area when he saw a large group fighting near the stage and then later heard that some people were talking about a girl getting raped." [125] at 10. Plaintiff also denies that he told the detectives that he overheard Mallory talking with Ezra or Ronnie, but admits the accuracy of the remainder of the paragraph quoted above. [125] at 10.

On December 31, 1981 at approximately 9:10 p.m., Hugo and Martha viewed a line-up at Area 3 Violent Crimes. The line-up consisted of four suspects (Plaintiff, Brooks, Ronnie, and Ezra) and four "fillers." Hugo viewed the line-up and made no identifications. Martha then viewed the line-up and identified Plaintiff, Brooks, and Garner as the offenders who pulled her clothing off, Brooks as the person who stole her necklace, and Garner as the man who put his hand in her vagina. Martha also identified Donnell Howard as one of her attackers, but he was subsequently released from custody without charge. The detectives prepared a report stating that, following her viewing of the line-up, Martha stated the following "in essence but not verbatim": "[A]fter her boyfriend [Scott] was hit over the head with a crowbar and left the amphitheater she returned to where the[ir] seats were to tell her brother [Hugo] and his girlfriend [Denise] that they should leave. Upon returning to their seats she was attacked by approximately 20 m/b's who tore her clothes off and beat her and attempted to rape her she managed to break loose and ran to a security guard. . . . After receiving no help from [the first security guard she spoke with] she managed to run to another security guard who escorted her to the first aid station." [122-1] at 7-8.

Plaintiff objects to the Court considering this report on the basis that "[t]here is no statement in the supplementary reports of what Martha told the Detectives, other than the

purported line-up identifications." [125-1] at 11. However, the statement quoted above does appear in the report that Defendants filed in the record, see [122-1] at 7-8, and addresses more than just Martha's identification of Plaintiff at the line-up. Plaintiff also objects to the use of contents of the report as hearsay on the basis that the detectives' reports are inaccurate and therefore not subject to the Rule 803(6) hearsay exception for business records. See Fed. R. Evid. 803(6). Plaintiff argues that he has demonstrated pursuant to Rule 803(6)(E) that the "method or circumstances of preparation" of the report "indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). The Court concludes that it would be premature to exclude the supplemental report from the record on the basis on Rule 803(6)(E) at the summary judgment stage. First, Plaintiff has not met his burden to show that "the evidence is inadmissible on all potential grounds" under the Federal Rules of Evidence. *Euroholdings Capital & Inv. Corp. v. Harris Trust & Sav. Bank*, 602 F. Supp. 2d 928, 934 (N.D. Ill. 2009). Second, while Plaintiff has raised legitimate questions concerning the trustworthiness of the report's description of the interview with Powell—including by pointing to Powell's recent deposition testimony denying that he identified Plaintiff as an assailant—Plaintiff has not raised any specific concerns about the accuracy of the report's description of the detectives' interview with Martha. Although the report does not specifically mention that Martha lost consciousness for some time during the attack, it is not inconsistent with Martha's medical report or subsequent testimony and therefore does not indicate that the report is untrustworthy. Third, Plaintiff has not demonstrated that Martha would be unavailable to testify at trial. Cf. *United States v. Anderson*, 450 F.3d 294, 302 (7th Cir. 2006) (police officer's testimony about statements made to him during his investigation by three of the informants who testified at the trial was not hearsay where statements were

consistent with informants' testimony, all three informants were subjected to cross-examination, and their credibility was attacked).

On January 1, 1982, just after she was discharged from the hospital, Denise met with Ptak alone and viewed a stack of approximately ten to twenty photographs. After reviewing the photographs, Denise identified Plaintiff and Knight as two of her assailants. Subsequently, Denise viewed a line-up at Area 3 Headquarters and identified Plaintiff and Knight as two of her assailants. It is disputed whether Denise identified Plaintiff based on her own observation of Plaintiff during the attack or instead based on Ptak's use of suggestive techniques during the photo array, in particular re-inserting Plaintiff's photo multiple times into the stack of photos (as discussed below).

Felony Review Assistant States Attorneys ("ASAs") Kershner and Hyman reviewed the evidence and approved charging Plaintiff, Ezra, Robbie, and Brooks each with three counts of robbery, one count of deviate sexual assault, and one count of attempted rape. They also approved warrants for the arrest of Knight and Mallory. Plaintiff disputes these facts to the extent that they are based on Duffin's and Ptak's supplemental report and claims that they are hearsay. The Court is not persuaded by this argument because Plaintiff has not identified any out-of-court statements in the supplemental report that Defendants are using to prove the truth of the matter asserted, *i.e.*, that the prosecutors decided to charge Plaintiff and his co-defendants with certain crimes.

On January 3, 1982, the Chicago Sun Times reported in an article that a women from Cicero had reported to CPD on January 2 that she had been assaulted at the Amphitheater on December 29, 1981, as well, and that she identified as her assailant one of the four men who had already been arrested. The woman from Cicero is not referenced in any police reports relating to

the attacks on Denise, Martha, and Hugo.  The Sun Times also reported that other witnesses told Duffin and Ptak that they would have intervened in the attack but were too scared.

Within the next few days additional persons were arrested, line-ups were held, and felony review ASAs approved charges against Mallory, Kevin Tyler ("Tyler"), Michael Neal ("Neal"), and Kenneth Ford ("Ford").  On January 8, 1982, Knight was also arrested.

Following the arrests, Duffin and Ptak learned the names of the four security guards who were working around the main stage area of the Amphitheater during the incident.  One of the guards was William Henrichs ("Henrichs"), who was also a Cook County Sheriff's deputy. Henrichs did not come forward as a witness until Detectives Duffin and Ptak contacted him. They interviewed Henrichs around January 8, 1982 and prepared a supplemental report reflecting the following:

> Williams Henrichs stated in essence but not verbatim the following: When the doors first opened I was standing by the Halstead street south entrance. I was searching people coming through the doors. At one point about fifty to one hundred people broke through and gained entrance by crashing the gate and not paying to get in. As the band came onto the stage I was transferred to a stationary assignment approximately ten feet south of the stage. Somewhere around mid-night a female latino [sic] came up to me she was crying hysterically stating that members of the audience tried to rape her. I observed that her shirt and her pants had been torn and her pants zipper was torn. I recognized her as a girl I had admitted through the gate. I told her to come with me to first aid she told me no they still have my brother and his girlfriend. I left her with the back stage security officer I don't know his name. I then proceeded north across the front of the stage and got Larry and three other security people to help me. We entered the disturbance and observed thirty to forty m/b's creating a disturbance. We pushed our way through and pulled numerous people off a pile. We then observed several m/b's holding down and beating a m/L and also a f/L being pinned to the floor with one m/b pulling at her breasts as if to be attempting to pull them off and another m/b on his knees jamming an object in and out of the girls vagina. The girl was curled up in a ball. Both latinos [sic] were nude. Larry pulled them back stage away from the crowd. We were unable to apprehend any of the m/b's as we were outnumbered six to one and further we were mainly concerned about getting the victims to safty [sic]. After arriving at the first aid station I observed that the girl had numerous bruises and contusions on her face, back, neck and legs and that the boy had a black eye and a cut on his cheek and bruises on his back. The

girl was bleeding profusely. The nurse called for an ambulance and the police. Also some of the security called the police and the fire dept. A few days after the incident I was watching television and I saw the first four people who were arrested on television in custody. I recognized all of them as being in attendance at the concert the night of the incident. Further I recognized one of them as the person I saw jamming something into the girls vagina.

[125] at 13 (quoting [107-19] at 3). The supplemental report also states that Henrichs was shown "numerous photos" and "identified the photo of [Plaintiff] as the person he observed jamming a foreign object into the girls vagina." [107-19] at 3. It further states that Henrichs identified Brooks, Ezra, and Ronnie "as people he saw enter through the gate he was watching," but that he did not recall Plaintiff passing through his gate. *Id.*

Plaintiff objects to Defendants' use of this supplemental report on the basis that it is "inherently unreliable and therefore is hearsay" under Federal Rule of Evidence 803(6)(E). [125] at 14. As evidence, he points to Hugo's 2013 deposition testimony, which is discussed in more detail below. When Hugo was asked whether "any security guards [came] to [his] aid while [he was] being punched and kicked," he testified: "No. After . . . the crowd had—the only way I could describe it is like they had backed off to see what they had done to us. Only then is when I actually remember seeing a man in a yellow coat that was security." [124-11] at 3-4. When asked, "[d]id you ever see any security ripping people away from you or the scene," he responded: "No. Nobody came to help us, nobody." *Id.* at 4. The Court concludes that it will not exclude the supplemental report from the record on the basis on Rule 803(6)(E). The fact that Hugo did not (more than thirty years after the fact) recall seeing security guards pulling people off of him does not demonstrate that the supplemental report is inherently unreliable. Further, Hugo and Denise both testified at the time of the trial in 1982 that security guards pulled people off of them. [122-4] at 77, 103-04.

On January 24, 1982, Duffin and Ptak interviewed Garnett Dubose ("Dubose"), who was also in attendance at the Amphitheater on the evening of the incident. Dubose was under arrest on an unrelated charge at the time of the interview. The report that the detectives prepared stated that Dubose "stated in essence but not verbatim" that he was at the concert with Francine Harris ("Francine") and "observed between twenty to thirty m/b's attack a young white couple who were seated in front of him." [122-10] at 3. The report states further that Dubose and Francine were seated "about nine rows back from the incident" and that 'Francine probably got a good look at the offenders as she was watching the incident through a pair of binoculars." *Id*. According to the report, the detectives showed Dubose "numerous photos and he identified the photos of [Plaintiff] and Ricky Knight as two of the m/b's who were attacking the young white couple" and stated that "he saw these two going in and out of the pile that was on top of the aforementioned couple." *Id*. At the subsequent suppression hearing, Dubose testified that he was shown a pile of photographs and picked out two photos and told the detectives, "These are the two people I'm sure I saw at the Amphitheater." [123-13] at 30.

Plaintiff objects to the portion of the police report concerning Dubose as hearsay under Rule 803(6)(E). The Court is not persuaded because Plaintiff does not cite to any evidence in the record showing a lack of trustworthiness with the part of the report that recounts Dubose's testimony. The Court will not discount the entire report as hearsay simply because Plaintiff questions the accuracy of other parts of the report, such as its description of Powell's statement to police.

### C.     Pre-Trial Proceedings

On January 4, 1982, Duffin testified before the grand jury on charges against Plaintiff and seven other suspects. He testified that his investigation revealed that Plaintiff was a gang

member; that Plaintiff and the other suspects approached the three victims as a group and attacked them; that they stole from the victims; that members of the group sexually assaulted Denise and Martha; that members of the group including Plaintiff were overheard admitting their participation in the attack; and that "a witness or all of the victims" identified each participant. [137] at 27.

The Grand Jury returned an indictment against Plaintiff for: 1) attempted rape, deviate sexual assault, three counts of aggravated battery, robbery, conspiracy to commit rape, and conspiracy to commit deviate sexual assault of Denise; 2) aggravated battery and robbery of Hugo; and 3) attempted rape, aggravated battery, robbery, and conspiracy to commit rape of Martha. Judge Strayhorn was the presiding judge.

Plaintiff retained Jack Rodgon ("Rodgon") as his defense attorney. Shortly after Hampton was indicted, Rodgon issued a subpoena *duces tecum* to CPD's keeper of records requesting "any and all police reports." [125] at 15. On April 22, 1982, while discovery was ongoing, Rodgon issued a subpoena *duces tecum* to the Commander of Area 3, Stibich, and to Lt. Joseph Curtin at Area 3 Violent Crimes requesting "any and all reports, records, memorandums, statements and any other documents you may have involving the investigation …. including but not limited to any and all street files that may have been prepared by officers in area 3." [125] at 16. On April 23, 1982, Judge Strayhorn entered an order instructing the Cook County State's Attorney and Superintendent of CPD to preserve all handwritten notes, memoranda, tape recordings, and other records prepared in connection with the case by arresting officers and investigative personnel, commonly known as a "street file." [125] at 16.

On May 7, 1982, the deadline for returning the subpoenas, ASA O'Connor represented to the Court that he "had a conversation with the detective that worked on this case" and "[t]here is

no street file." [125] at 16. He further clarified that, "to our knowledge, there is no street file, now or ever," and that "[t]o our knowledge, . . . we are giving [the defense] what we have." *Id*. Stibich and Curtin failed to appear at the scheduled hearing concerning the subpoenas. Four days later, on May 11, 1982, Rodgon filed petitions for rule to show cause against Stibich and Curtin for their failure to appear. The same day, Judge Strayhorn issued orders requiring Stibich and Curtin to appear on May 26, 1982 "to show cause why they should not be held in contempt of court." *Id*. at 17. The record does not reflect how the order to show cause was resolved.

During pre-trial proceedings, Plaintiff's attorney Rodgon made an oral motion to quash Plaintiff's arrest and the subsequent identifications by the state's witnesses. Rodgon followed this up on June 11, 1982, by filing a motion to suppress testimony concerning the line-up Plaintiff participated in and the in-court identification of Plaintiff by the state's witnesses. See [107-33]. He offered the following points in support of his motion to suppress: 1) prior to being placed in the line-up, Plaintiff was handcuffed and was presented to certain identification witnesses of the state, and police officials indicated to the identification witnesses that he was the perpetrator of the crime; 2) Plaintiff believed that the identification was induced by the activities of the police at the police headquarters; and 3) "the witness, prior to any corporal identification of [Plaintiff], observed photographs in a manner that was unnecessarily suggestive." [125] at 17-18 (quoting [107-33] at 3).

While these motions were pending, six of Plaintiff's eight co-defendants pled guilty and received sentences of six months with credit for time served. [125] at 18. On July 30, 1982, Plaintiff's oral motion to quash Plaintiff's identification was heard. Plaintiff's counsel and Knight's counsel questioned Ptak. Ptak testified that Duffin had taken notes during his initial interview with Powell, that the notes were reduced to a written report, and that the notes were

then destroyed.  According to Ptak, he watched Duffin rip up the notes and throw them in the waste basket.  *Id*. at 19.  The Court denied Plaintiff's motion to quash.

On September 1, 1982, Judge Strayhorn heard argument on Plaintiff's written motion to suppress.  Hugo, Denise, Martha, Powell, and Ptak also testified at the suppression hearing.  Upon questioning by Knight's attorney, Gary Brownfield ("Brownfield"), Hugo testified that he went to the police station on December 31, 1981 and viewed a line-up, and that no police officer said anything to him prior to viewing the line-up.  [136-1] at 105, 111.  He further testified that after the line-up, he looked through a stack of about twenty color photographs and recognized one person from the photos.  *Id*. at 106-108.  Officers Duffin and Ptak handed him the photographs and told him to look at them, but did not tell him what he was looking for, who the photographs were of, or whether there was a suspect among the photos.  *Id*. at 109.  Hugo picked out one photo from the stack (Knight's) and handed it the officers.  *Id*. at 110.  Hugo testified that he viewed a second line-up at the police station on January 8, 1982, and identified the same person who he had identified in the photographs he viewed on December 31. *Id*. at 112, 116.  According to Hugo, the officers did not tell him anything when he viewed the line-up.  *Id*. at 116.  Hugo further testified that he never identified Plaintiff in a line-up and that no one ever identified Plaintiff to him.  *Id*. at 117.

At the suppression hearing, Rodgon and Brownfield also cross-examined Denise at length about the photographs that she viewed and the identifications that she made.  Denise testified that she and Ptak did not have any conversation before she viewed the photo array.  Brownfield examined Denise first.  Specifically, Denise testified:

> Q: And do you remember how many photographs they showed you?
> A: It was about ten to twenty.
> ….
> Q: Do you remember who showed you these photographs?

> A: Detective Ptak.
> Q: And where was this?
> A: It was close to the lobby in a little square room near the lobby.
> Q: And what date was this on again?
> A: January 1st.
> Q: And about what time was that?
> A: It was in the morning?
> Q: Prior to Officer Ptak showing you these pictures, what, if anything, did he say
> to you?
> A: Nothing, he just said to look at the pictures and see if I recognized anybody.
> Q: Did he tell you that any of the offenders were in the photographs?
> A: No.

[125] at 20; see also [136] at 8; [136-1] at 6-53. Denise further testified that when she looked at the photos, they were not spread out on a table, but "they were by hand, I was looking at them one at a time." [136-1] at 12. She then made in-court identifications of Plaintiff as one of the two people she recognized in the photographs. *Id*. at 13. Rodgon then questioned Denise. He asked her, "while you were looking at the pictures, was there any other conversation between yourself or Officer Ptak," and she responded, "No." [136-1] at 23-24. At the close of the testimony, the motion to suppress was denied on the basis that Plaintiff had not presented any evidence indicating that any illegal police activity lead to the witness identifications.

On October 7, 1982, Rodgon issued a subpoena *duces tecum* to Officer Barberio and Officer Garmon of the CPD requesting any and all police records, reports, memoranda, and street files related to Plaintiff and involving the December 29, 1981 incident.

## D.     Plaintiff's Criminal Trial and Direct Appeal

On October 12, 1982, Plaintiff's trial began. His case was tried simultaneously with the cases against Knight and Mallory, with three separate juries. Powell was called as a witness by the prosecution. He testified that, at the end of the concert, he saw a group of men coming down the aisle toward the stage making gang signs and chanting gang slogans. He identified Plaintiff, Knight, and Mallory as members of the group. [137] at 18. However, he did not testify that he

saw Plaintiff do anything. Powell also testified that Plaintiff was in the group that got on the bus with Knight following the concert and that the group were heard "bragging about what they did to that girl" and talking about taking jewelry. [137] at 18. However, Powell did not testify about who specifically said what.

Henrichs testified at trial that he saw Plaintiff enter the concert gate and searched him. Henrichs stated that just after midnight, a woman with torn clothes approached him and told him that others were being attacked. He testified that he approached the stage with other guards and saw a large crowd of black men in a circle. Henrichs further testified that he saw Plaintiff thrusting his arm toward a woman's vaginal area and that on January 6, 1982, he identified Plaintiff and three other participants in a photo array. According to Henrichs, another security guard pulled Plaintiff off of Denise.

Hugo testified at trial that when he, Martha, and Denise saw the men move toward the front of the stage, they attempted to leave but had their path blocked and then were attacked. Hugo further testified that he was hit, kicked, and punched and had his wallet, keys, and jewelry stolen. Hugo identified Knight in court as one of his and Denise's attackers and testified that he had identified Knight from a photo array and a line-up. Hugo testified that a "black guy in a yellow coat" (a security guard) came and pulled him out of the crowd and that "another guy in a yellow coat was taking Denise out." [122-4] at 103-04.

Martha testified at trial that she ducked when she saw Knight about to hit her with a chair and that a number of men then starting hitting and kicking her. She testified that there were as many as thirty or thirty-five men around her, grabbing at her clothes and jewelry. Martha further testified that Plaintiff was the man who tore her pants and "tried to put his hand in her vagina."

[125] at 24.  She also testified that she managed to get away, heard someone yell "get her," and saw Knight behind her.  *Id*. at 24.

Denise testified at trial that she was beaten, sexually brutalized, and robbed of her clothing and jewelry.  She testified specifically that Knight put his penis in her mouth and that Plaintiff attempted to put a cold, hard object in her vagina.  [122-4] at 76.  She further testified that a man in a yellow coat eventually pulled the men off of her and they scattered.  *Id*. at 77.  She also confirmed her earlier identifications of Plaintiff from the photo array and in the first line-up she viewed at the police station.  Rodgon cross-examined Denise regarding her identification of Plaintiff.

At the conclusion of trial, the jury was provided with instructions.  One of the instructions informed the jury on a theory of accountability: "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."  [125] at 25.

The jury found Plaintiff guilty of (1) attempted rape, deviate sexual assault, robbery, and aggravated battery of Denise; (2) robbery and aggravated battery of Hugo; and (3) robbery and aggravated battery of Martha.  Plaintiff was found not guilty of attempted rape of Martha.  See [106] at 18.  On November 18, 1982, Plaintiff was sentenced to concurrent sentences of 60 years for deviate sexual assault, 15 years for attempted rape, 7 years for three counts of robbery, and 5 years for three counts of aggravated battery.

Plaintiff immediately filed a motion for new trial. The motion was denied. Plaintiff then filed an appeal to the Illinois Appellate Court, First District, which affirmed his conviction. See *People v. Knight*, 139 Ill. App. 3d 188 (Ill. App. 1985).

E.    **Challenges in the 1980s to the City's Use of "Street Files"**

The City's use of "street files" became the subject of litigation in the 1980s in at least two federal cases in this district, *Palmer* (No. 82-cv-2349) and *Evans* (No. 04-cv-3570). In 1983, Judge Shadur issued a preliminary injunction requiring police to preserve street files. See *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985) (concluding that class of plaintiffs who had been convicted of felonies in Cook County Circuit Court had alleged sufficient harm to establish standing for their requested preliminary injunctive relief to preserve their "street files," and holding that injunction would issue to preserve the "street files" now in existence for persons convicted of felonies and to allow those persons an opportunity to view content of files, upon the filing of a properly drafted, specific subpoena); *Evans v. City of Chicago*, 2006 WL 463041, at *14 (N.D. Ill. Jan. 6, 2006) (recognizing that "[t]here is . . . little question that maintaining non-disclosed 'street files' was the custom of the City [in 1976] and until Judge Shadur issued a preliminary injunction in . . . *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983)").

In 1981, Stibich was the commander of Area 3, in which Duffin and Ptak worked. Stibich testified in the *Palmer* litigation that in investigations of violent crimes in Area 3, there was an "office file" and, in some cases (but not all cases), a "working file." He testified that there would not necessarily be a working file for rape, aggravated assault, or robbery cases. According to Stibich, prior to entry of the temporary restraining order in *Palmer*, the practice in Area 3 was to destroy the street file or return it to the detectives once a closing report was written

in a case. It was the Sergeant's job to go through the working file to determine whether or not the memos and reports were put in supplemental reports.

Sergeant Owens was deposed in this case about the City's use of street files prior to the *Palmer* litigation. He testified that at the end of an investigation, the street file would be assembled and given to a secretary, who would pull out any duplicates and put anything that was pertinent into the regular file, if it was not already there. The secretary would go to a sergeant or lieutenant with any questions about whether or not something should be included in the regular file.

The Superintendent is responsible for the management and control of the CPD. Chicago Police Superintendent Richard Brzeczek testified in the *Evans* litigation that he did not know if detectives purposefully withheld information in the street files as a matter of routine, but he knew of "situations where, just based on human nature, there would be detectives who would not turn over all information or exculpatory information." [137] at 34. He also acknowledged that some detectives did not memorialize all of their notes in official department reports. On April 19, 1982, Brzeczek issued Department Order 82-2, which provided: "Effective immediately, as a result of a [TRO] issued by federal district court judge Thomas R. McMillen, the contents of all police department investigative files known as office, unit, or working files and sometimes referred to as 'street or running' files will be kept intact. No documents, materials, or notes shall be removed from these files." [137] at 37. On September 19, 1982, the *Palmer* plaintiffs filed a motion to amend the temporary restraining order because they claimed that detectives were violating its letter and spirit by maintaining investigative writings and files as their own personal property to avoid the mandate of the TRO.

According to Duffin's deposition testimony in this case, in 1981 Area 3 used "progress files" for investigations that were followed from shift to shift.  The progress files would include notes and reports.  The purpose of the progress file was to inform other detectives working on a case what had been done and to give instructions on what needed to be done.  Anyone working on the file was supposed to document what he or she did on that day on the case.

**F.    Plaintiff's Post-Conviction Proceedings**

In 1990, Plaintiff filed a *pro se* petition for post-conviction relief alleging that his constitutional rights were violated because: (1) he was arrested without probable cause; (2) he was subjected to a suggestive show-up and line-up identification; and (3) he was denied effective assistance of appellate counsel due to appellate counsel's failure to raise the first two issues.  His petition was dismissed.  The dismissal was affirmed by the Illinois Appellate Court, First District.  See *People v. Hampton*, 296 Ill. App. 3d 1065 (Ill. App. 1998).

In 1999, Plaintiff petitioned the federal district court for a writ of *habeas corpus*, arguing that he received constitutionally ineffective assistance of counsel at trial and that his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Judge Kennelly granted the writ on the basis of ineffective assistance of trial counsel due to counsel's failure to investigate and interview exculpatory witnesses.  See *Hampton v. Leibach*, 290 F. Supp. 2d 905, 922-23 (N.D. Ill. 2001). The Seventh Circuit affirmed and remanded to the Cook County Circuit Court for a new trial.  See *Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003).

The state initially indicated an intent to re-try Plaintiff on all counts.  ASAs Maria McCarthy ("McCarthy") and Dan Groth ("Groth") were in charge of the case.  As they were preparing to re-try Plaintiff, McCarthy and Groth met with Martha, Denise, Henrichs, and Hugo.  Martha could not remember the events at the Amphitheater back in 1981.  Hugo had not

identified Plaintiff at that time. Henrichs' story remained the same but McCarthy questioned the strength of his testimony because he saw Plaintiff's face for only four or five seconds on the night of the attack and saw him for several minutes during the subsequent news coverage. McCarthy also felt that there were some inconsistencies between the police report prepared from Henrich's interview and Henrich's trial testimony. According to a report that McCarthy prepared, Denise was no longer sure that Plaintiff had physically done anything to her. Also according to the report, Denise told McCarthy that when she was shown the photo array, Ptak kept taking Plaintiff's photo out and putting it back in the pile, asking questions to the effect of, "does this look like the guy?" and "do you recognize him"? [124] at 3. According to the report, McCarthy asked Denise if she felt pressured to make the identification of Plaintiff, and Denise said yes, because she was young at the time and trusted the detectives. Further, according to the report, Denise told ASA McCarthy that her line-up identification of Plaintiff was based on the photograph and not on her own observation and that all of her subsequent identifications of Plaintiff were based on the photograph.[4]

Ultimately, McCarthy and Groth decided not to re-try Plaintiff, concluding that the state could not meet its burden of proof at trial. A *nolle prosequi* dismissal order was entered on October 5, 2011.

### G.     This Lawsuit

On July 18, 2012, Plaintiff filed his complaint in the instant lawsuit against the City, Duffin, and Ptak. Plaintiff alleges that the City and the individual Defendants violated his due process rights, in violation of 42 U.S.C. § 1983, by deliberately withholding exculpatory evidence and fabricating false reports, false statements, and other evidence (Count I).

---

[4] Defendants object on hearsay grounds to the introduction McCarthy's report to the extent that it reflects Denise's statements to McCarthy. The Court addresses Defendants' objections below in its discussion of the deposition testimony that Denise provided in this lawsuit.

Specifically, Plaintiff alleges that Duffin and Ptak authored and signed police reports falsely claiming that Powell had identified Plaintiff as one of the assailants and as a member of the Third World Black Gangster Disciples. [1] ¶ 25. Plaintiff also alleges that Duffin and Ptak manipulated and pressured Denise to identify Plaintiff as one of her attackers, by drawing her attention to Plaintiff's photograph, and falsely reported that Denise recognized Plaintiff based on his facial features and clothing. [1] at ¶¶ 28, 31. Plaintiff alleges that this misconduct was a result of the City's deliberate indifference to its policies and widespread practices, including 1) use of "street files"; 2) use of manipulated or fabricated evidence; and 3) the CPD's "code of silence." Plaintiff also alleges claims against the individual Defendants for failure to intervene (Count II), Section 1983 conspiracy (Count III), and state law claims for malicious prosecution (Count IV), intentional infliction of emotional distress (Count V), and civil conspiracy (VI). Finally, Plaintiff alleges claims against the City for respondeat superior (Count VII) and indemnification (Count VIII).

A number of depositions were taken in this litigation. The following deposition testimony is identified by the parties as relevant to resolving Defendants' motion for summary judgment.

**Plaintiff**—Plaintiff testified that he snuck into the theater and did not enter through the gates. During the concert, he saw a number of fights break out and, toward the end, saw a commotion near the front by the stage that looked like a big fight. Then the lights were turned on, security officers went into the crowd where there was a disturbance, and the concert ended. Plaintiff and his friends left the Amphitheater and took the bus home. As they were leaving, Plaintiff overheard someone say that two women and a man had been raped. On the bus ride

home, he heard Mallory brag that he "kicked the lady in her stuff." He heard others bragging, too, but did not recognize their voices.

**Denise**—Denise was asked about her viewing of photos with Ptak, during which she made her first identification of Plaintiff. She was asked, "during that photo array . . . d[id] Detective Ptak do anything to you during that process that leads you to believe today that you were wrong when you picked out [Plaintiff]?" [142] at 19, p. 56:13-17. Denise responded, "Not the way I think now, no," but that she "[p]robably" had waivered in that belief when she spoke to ASA McCarthy. *Id*., pp. 56:17-57:7.

Denise was also asked about the truthfulness and accuracy of testimony she provided at Plaintiff's suppression hearing. At the suppression hearing, Denise answered "No" to the question, "Prior to viewing any of the lineups, did any of the members of the [CPD] or the office of the State's Attorney cause you to pick anyone out by any suggestions, comments, critiques?"; at the deposition she said this testimony was "true because that's what I believed back then to be true[, a]nd I still do." [142] at 17, pp. 48:19-49:5. At the suppression hearing, Denise testified that she identified Plaintiff from his photo "by [his] face" and because she "noticed [he] was wearing the same coat[]"; at the deposition, she stated that this testimony was "what I believed back then [a]nd now." *Id*. at 18, p. 52:12-23.

Denise was further questioned about her conversation with ASA McCarthy and the contents of ASA McCarthy's report. When asked whether she was "truthful" when she "talked to Maria McCarthy in 2011," she answered "Yes, if—yes." [142] at 20, p. 60:10-12. Denise explained that when she told McCarthy that she felt "pressured during th[e] process of looking through . . . photographs" with Ptak, she "didn't feel pressured like he was telling me to pick somebody out," but "just felt pressured like I didn't want to be in that situation" and did not

mean to convey to McCarthy "that Detective Ptak pressured [her] to make an identification of [Plaintiff]." *Id*. at 19, pp. 55:14-56:3. Denise was asked if she "t[old] Maria McCarthy that [Plaintiff's] photograph was reinserted into the group of photographs several times" when she viewed them with Ptak. *Id*. at 20, p.60:18-20. She responded, "You know, I believe I saw that that was down there [in the memo], but I do not recall telling her that. My memory right now does not recall telling her that." *Id*., p. 60:21-24. When asked, "[a]nd do you have any recollection right now one way or another of whether you viewed [Plaintiff's] photograph more than one time when you looked at that group of pictures," she responded, "No, I don't have a recollection of that." *Id*., p. 61:1-5. Likewise, she testified that she "d[id]n't remember" if Plaintiff's photo was reinserted into the group of photos more than once by Ptak. *Id*., p. 61:18-23. When asked if she told McCarthy that "Ptak said something like 'How about this guy?' or "Do you recognize this one'?" when she got to Plaintiff's photo in the array, Denise responded, "If I did say that to her, than that should be true that I said that at that time, yes"; but Denise further stated that she did not "remember that now." *Id*. at 20-21, pp. 61:24-62:11. Finally, when asked whether she told McCarthy that she "w[as] not sure if [Plaintiff] actually did anything physically" to her, Denise said "[i]f it's down there [in the memo], then I said it," and "that would be my memory today." *Id*. at 21, p. 64:3-10.

Defendants object to Plaintiff's use of McCarthy's report or testimony to avoid summary judgment. Defendants argue that the report and testimony concerning what Denise said are hearsay and not admissible under any exceptions to the hearsay rule. Plaintiffs respond that McCarthy's report is admissible as substantive evidence on at least three grounds.

First, Plaintiff argues that the statements attributed to her by ASA McCarthy are not hearsay as defined in Federal Rule of Evidence 801(c) because Denise acknowledged under oath

at her deposition that the statements were true. If Denise denies at trial that her statements to McCarthy were true, Plaintiff argues, then the deposition testimony admitting the truthfulness of those statement is admissible as a prior inconsistent statement under Rule 801(d)(1)(A). Plaintiff further argues that "[i]f Denise denies any recollection, her deposition testimony that the contents of McCarthy's report are true would be admissible as former testimony under Rule 804(b)(1)." [142] at 4. Defendants deny that Plaintiff affirmed the accuracy of McCarthy's report in her deposition; instead, they assert that Denise merely testified that she had told McCarthy the truth when the two spoke (during which time Denise was not under oath).

Both parties' are somewhat inaccurate in their characterization of Denise's deposition testimony. Denise testified that she was truthful when she spoke to McCarthy, but she did not affirm the accuracy of McCarthy's entire report. She also did not subscribe to or adopt McCarthy's statements about what Denise allegedly told her about Ptak reinserting Plaintiff's picture into the photo array or speaking to her during the photo array; instead, she testified that she could not remember what she told McCarthy or what actually happened during the photo array over thirty years earlier. But Denise did affirm certain discrete portions of McCarthy's report. In particular, in response to the question, "did you tell her, . . . you were not sure if he [Plaintiff] actually did anything physically," Denise testified, "If it's down there [in the report], then I said it. And that would be my memory today." [142] at 21, p. 64:3-10. This small part of the report qualifies as a prior statement of Denise, and is not hearsay under Rule 801(c), because she testified that it is true. See *United States v. Schoenborn*, 4 F.3d 1424, 1427 (7th Cir. 1993) ("A third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." (quotation marks and citation omitted)). Certainly, this part of the report calls into question the basis for Denise's

identification of Plaintiff as one of her assailants. But it does not attribute Denise's uncertainty to anything that Ptak (or Duffin) did, such as reinserting Plaintiff's photo into the array.

Contrary to Plaintiff's argument, the part of McCarthy's report that claims that Denise admitted that Ptak reinserted Plaintiff's photo into the array and that this influenced her identification would not be admissible at trial as a prior inconsistent statement under Rule 801(d)(1)(A), because Denise did not testify at her deposition that that part of McCarthy's report was true, and because Denise's statement to McCarthy was not "given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition." Fed. R. Evid. 801(d)(1)(A). And if Denise testifies at trial that she did not remember telling McCarthy that Ptak reinserted Plaintiff's photo into the array, the contents of McCarthy's report on this topic would not be admissible as former testimony under Rule 804(b)(1), because Denise's conversation with McCarthy was not "given as a witness at a trial, hearing, or lawful deposition." Fed. R. Evid. 804(b)(1)(A).

Plaintiff's second argument in favor of admitting McCarthy's report is that Denise's statements were declarations against her interest and therefore excepted from the hearsay rule under Federal Rule of Evidence 804(b)(3). Plaintiff argues that Denise's statement to McCarthy about Ptak's use of suggestive techniques and their influence on her exposed Denise to potential perjury charges. Defendants respond that this concern is baseless, because Denise's deposition testimony does not reflect any concern that she gave perjured testimony in 1982 and ASA McCarthy has never testified or implied that she has contemplated perjury charges against Denise.

In cases where the declarant is unavailable, Rule 804(b)(3) excepts from the hearsay rule "[a] statement that: (A) a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's

proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."  Fed. R. Evid. 804(b)(3).  "In assessing whether to admit evidence under Rule 804(b)(3), courts look to three factors: (1) whether the declarant is 'unavailable' to testify at trial; (2) whether the statement at issue was against the declarant's penal or pecuniary interest; and (3) whether corroborating circumstances exist that bolster the statement's trustworthiness."  *United States v. Hawkins*, 2013 WL 11322824, at *2 (N.D. Ill. Nov. 6, 2013), *aff'd*, 803 F.3d 900 (7th Cir. 2015).  Plaintiff, as the proponent of the evidence, has the burden of showing that all three factors have been satisfied.  See *United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008).

In this case, the first factor is satisfied.  A declarant is "unavailable" for purposes of this rule if she "testifies to not remembering the subject matter."  Fed. R. Evid. 804(a)(3).  Denise testified at her deposition that she did not remember telling McCarthy that Ptak used suggestive techniques during the photo array or what actually occurred at the photo array.

The second factor presents a closer call.  The key question is whether Denise's alleged statements to McCarthy had a great tendency to expose her to civil or criminal liability, such that a reasonable person in her position would have made the statements only if they believed them to be true.  Denise would be immune from civil liability for alleged perjured testimony provided during Plaintiff's criminal trial or in a deposition.  See *Manning v. Miller*, 355 F.3d 1028, 1034 (7th Cir. 2004); *Mayes v. City of Hammond*, 442 F. Supp. 2d 587 (N.D. Ind. 2006) (a witness who commits perjury is granted absolute immunity from civil liability for trial and deposition testimony).  But Denise hypothetically could have been exposed to criminal perjury charges after

giving her statement to McCarthy. Under Illinois law, perjury committed with a person "under oath or affirmation . . . makes a false statement, material to the issue or point in question, knowing the statement is false." 720 ILCS 5/32-2(a). While Denise's statement to McCarthy was not made under oath, her testimony at Plaintiff's criminal trial and suppression hearings was. At the trial and suppression hearing, Denise positively identified Plaintiff as one of her assailants. (She also testified at the suppression hearing that Ptak did not say anything to her during the photo array.) This testimony was clearly material to a key issue in question at the trial: who assaulted Denise? According to McCarthy's report, Denise told McCarthy that she was not sure that Plaintiff did anything to her physically, and also explained how she nonetheless came to identify Plaintiff as one of her assailants—through Ptak's repeated insertion of Plaintiff's photo into the array and questions during her viewing. Denise already admitted at her deposition that McCarthy's report was true to the extent that it said Denise was not sure Plaintiff did anything to her physically; this admission calls into question how Denise was then able to identify Plaintiff in a photo array. If Denise in fact told McCarthy that Ptak repeatedly inserted Plaintiff's photo into the array and talked to her during the array, and that this influenced her identification, those statements suggest that Denise's identification testimony at trial was knowingly false and made to ensure that Plaintiff was convicted.[5]

The final question is whether there are corroborating circumstances that bolster the trustworthiness of Denise's alleged statements to McCarthy. The Seventh Circuit has identified three non-exclusive "factors for district courts to consider when determining whether

---

[5] To be sure, the likelihood that any prosecutor would seriously contemplate perjury charges against Denise given the facts of this case appears extremely remote. There is no dispute that Denise was the victim of a vicious attack in 1981. Any changes in her recollection of that traumatic event three decades later might be attributable to a number of factors—*i.e.*, confusion, mistake, lapse of memory, passage of time, even PTSD—and the notion of bringing criminal charges on account of such discrepancies seems far-fetched. There is no suggestion in the record that the prosecutors assigned to retry Plaintiff in this case ever contemplated any such charges.

corroborating circumstances exist for Rule 804(b)(3) purposes: (1) the relationship between the declarant and the exculpated party; (2) whether the statement was voluntary and given after Miranda warnings; and (3) whether there is any evidence the statement was made to curry favor with authorities." *United States v. Jackson*, 540 F.3d 578, 589 (7th Cir. 2008). In this case, Plaintiff was convicted of brutally assaulting Denise. According to her deposition testimony, Denise continues to believe that Plaintiff was one of her attackers and was upset when she learned that Plaintiff was granted post-conviction relief. She had no apparent incentive for helping Plaintiff avoid re-prosecution by calling into question her earlier identification testimony. Denise provided her statement to McCarthy voluntarily, and there is no evidence that Denise made her statement to curry favor with the State. Neither party suggests, for instance, that McCarthy was trying to get Denise to undermine the strength of the State's case to avoid having to re-try the case. Instead, the State initially elected to re-try Plaintiff on all charges, and dropped the charges only after interviewing witnesses and determining that they did not have a strong enough case. Another piece of corroborating evidence is Hugo's deposition testimony (discussed in more detail below) concerning his conversation with Denise shortly after she was released from the hospital. Hugo's testimony that Denise told him that Ptak kept reinserting certain photos into the photo array and that she thought all of the subjects looked alike, [137] at 7, is consistent with McCarthy's report. Hugo, like Denise, had no apparent incentive to help Plaintiff avoid re-prosecution.

For these reasons, the Court concludes that Plaintiff has met his burden of showing that Denise's statements to McCarthy may be admissible at trial under Rule 804(b)(3), and therefore Defendants cannot show that McCarthy's report and her testimony concerning the same would be inadmissible for any purpose during the trial. The Court will consider McCarthy's report for

purposes of summary judgment. This decision is without prejudice to the reconsideration of the issue prior to trial based on any motions in limine that the parties may file.

Plaintiff advances one more hearsay exception in support of admitting McCarthy's statement—Rule 807's residual hearsay clause. "The purpose of Rule 807 is to make sure that reliable, material hearsay evidence is admitted, regardless of whether it fits neatly into one of the exceptions enumerated in the Rules of Evidence." *United States v. Moore*, 824 F.3d 620, 624 (7th Cir. 2016). Under Rule 807, a "hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804" if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
> (2) it is offered as evidence of a material fact;
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). A statement is admissible under the residual hearsay rule "only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, . . . so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). The person who provided the statement must be unavailable in order for the residual hearsay exception to apply. *Moore*, 824 F.3d at 623. In general, the Seventh Circuit has "warned against the liberal admission of evidence under Rule 807," lest this exception become "'the exception that swallows the hearsay rule.'" *Id.* at 624 (quoting *Akrabawi v. Carnes Co.*, 152 F.3d 688, 697 (7th Cir. 1998)).

Defendants argue that Rule 807 does not apply to the statements ascribed to Denise in McCarthy's report, because those statements lack sufficient guarantees of trustworthiness. (Defendants do not contest that the other requirements of Rule 807 are met.) Defendants assert

that Plaintiff cannot overcome the presumption that hearsay statements are unreliable because Denise's statements were made in relation to a traumatic events that occurred over thirty years ago; they were not corroborated by her under oath at her deposition or in the criminal proceeding; they were not recorded; and Denise testified at her deposition that she felt pressured by McCarthy and frightened when she heard of Plaintiff's release. See [147] at 15.

The Seventh Circuit has identified a number of nonexclusive, nonexhaustive factors for the district courts to consider when evaluating the trustworthiness of a hearsay statement under Rule 807. See *Moore*, 824 F.3d at 623. These factors include "(1) the probable motivation of the declarant in making the statement; (2) the circumstances under which it was made; and (3) the knowledge and qualifications of the declarant." *United States v. Hall*, 165 F.3d 1095, 1110 (7th Cir. 1999) (quoting *Cook v. Hoppin*, 783 F.2d 684, 690–91 (7th Cir.1986) (internal quotation marks omitted)). They also include "the character of the witness for truthfulness and honesty, and the availability of evidence on the issue; whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; the witness' relationship with both the defendant and the government and his motivation to testify . . . ; the extent to which the witness' testimony reflects his personal knowledge; whether the witness ever recanted his testimony; the existence of corroborating evidence; and, the reasons for the witness' unavailability." *Moore*, 824 F.3d at 622–23.

In this case, Denise would be "unavailable" to the extent that she denies (as she did at her deposition) having any memory of whether Ptak used suggestive techniques during the photo array or what she told McCarthy about that topic. Briefly considering the Rule 807 factors that Defendants do not dispute, evidence of Ptak's alleged use of suggestive techniques with Denise is evidence of a material fact and goes to the accuracy of Denise's identification of Plaintiff as

her attacker. The report is more probative than any other evidence that Plaintiff could obtain through reasonable efforts, because it is the only evidence specifically addressing whether Ptak re-inserted photos into the array that he showed Denise. The transcripts from the criminal trial and suppression hearing do not address this exact issue, and Denise denied at her more recent deposition having any knowledge of the issue. It may also serve the interests of justice to admit the report and to provide the jury with the full scope of relevant evidence on the issues that bear on Plaintiff's due process claims, which stem from his alleged wrongful conviction and decades-long incarceration.

The Court now turns to circumstantial trustworthiness of the McCarthy report under Rule 807. Denise's probable motivation does not appear to have been to help Plaintiff avoid re-prosecution. It seems more likely that her motivation was to truthfully answer McCarthy's questions. Defendants assert that Denise felt pressured by McCarthy at her deposition and frightened when she heard of Plaintiff's release from prison. But Defendants do not explain how this would motivate Denise to say that Ptak used suggestive techniques, if that was not really Denise's memory. Looking to other factors identified by the Seventh Circuit, Denise is the most knowledgeable person about what happened at the photo array with Ptak over thirty years ago (Ptak is now deceased), although the age of that incident may call into question the accuracy of Denise's memory. Denise gave her statement to McCarthy voluntarily, but was not under oath. At her subsequent deposition, she did not recant what she allegedly told McCarthy, but instead denied having any current memory of the discussion with McCarthy or the underlying photo identification procedure. Hugo's deposition testimony that Denise told him in 1982 that all the photos looked the same and that Ptak kept reinserting Plaintiff's photo into the array is consistent with and corroborates McCarthy's report (though Hugo's deposition testimony is subject to its

own hearsay problems, which are discussed below). Considering the record as a whole, the Court concludes that it contains circumstantial guarantees of the trustworthiness of McCarthy's statement documenting what Denise told her about Ptak's use of suggestive techniques and their effect on her identifications. Therefore, the Court will not exclude these parts of McCarthy's report from its summary judgment analysis. Again, the Court's decision is without prejudice to its ability to reconsider the issue prior to trial when the parties brief motions in limine.

**Hugo**—Hugo testified that Denise told him shortly after she was released from the hospital that she was not sure about her witness identifications and that "they [the men in the photos] all look alike." [137] at 7. Defendants object on hearsay grounds to Plaintiff's use of Hugo's testimony concerning his conversations with Denise. In response, Plaintiff argues that Denise's January 1982 statements to Hugo will be admissible at trial as a prior consistent statement. Specifically, Plaintiff argues that Denise will first testify consistent with her deposition that the statements in McCarthy's memo regarding Ptak's actions during the photo array and their influence on her were true. Second, Defendants will cross-examine Denise with her criminal court testimony that Ptak was silent during the photo array and did not influence her decision. Third, Plaintiff will then bring in Denise's statements to Hugo either 1) to rehabilitate her credibility under Rule 801(d)(1)(B)(ii), or 2) to rebut an express or implied charge of recent fabrication or improper influence or motive under Rule 801. Plaintiff's argument fails at the outset because at her deposition, Denise did not affirm the accuracy of McCarthy's memo to the extent that it recorded that Denise said Ptak used suggestive techniques during the photo array.

Plaintiff also argues that Hugo's testimony concerning what Denise told him is admissible under Rule 804(b)(3) as a statement against interest and Rule 807, the residual hearsay clause. But Defendants have not demonstrated that Denise is unavailable for purposes of

Hugo's statement. Denise was not questioned about Hugo's statement at her deposition and there is no evidence that she cannot remember what she told Hugo. Also, as to Rule 804(b)(3), it is unclear how Denise's statement to Hugo, which was made immediately after she was released from the hospital following the attack, could have possibly been against her interest in the sense of exposing her to potential civil or criminal liability.

Turning back to Hugo's deposition, Hugo testified that he viewed a photo array before seeing the line-up. According to Hugo, while he was viewing the photo arrays, Duffin and Ptak kept reinserting certain photos into the pile and referring back to them. Hugo further testified that during the line-up, the detectives kept coming back to certain numbers and asking questions like, "are you sure it wasn't three"? [137] at 8. Defendants object to Plaintiff's use of this testimony based on *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1169 (7th Cir. 1996), and *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517 (7th Cir. 1988). In *Bank of Illinois*, the Seventh Circuit held that a party cannot avoid summary judgment by creating a "sham" issue of fact by using later testimony from the party that directly contradicts the party's unambiguous prior statement made under oath. In *Adelman-Tremblay*, the Seventh Circuit extended the "sham" affidavit rule beyond parties to "the testimony and affidavit of the plaintiff's sole expert witness," reasoning that "[t]he purpose of summary judgment motions—to weed out unfounded claims, specious denials, and sham defenses—is served by a rule that prevents a party from creating issues of credibility by allowing one of its witnesses to contradict his own prior testimony." 859 F.2d at 521.

Defendants argue that Hugo's testimony that he viewed the photo array before viewing the line-up is contradicted by his earlier testimony that he viewed the line-up before being shown photos, and thus barred by the "sham affidavit" rule. [136-1] at 105-108, 11. Defendants also

argue that Hugo's testimony that Duffin and Ptak kept reinserting certain photos into the pile and referring back to them is contradicted by his earlier testimony that Duffin and Ptak simply handed him the stack of photos, he looked through them, and he handed one to the detectives. [136-1] at 109-110. They further argue that Hugo's testimony that the detectives asked him questions during the line-up is contradicted by his earlier testimony that the officers did not tell him anything when he viewed the line-up. [136-1] at 116.

Defendants also object to the admission of Hugo's deposition testimony that he told Duffin and Ptak during his interview that toward the end of the beating, a woman was kicking him in the back, but that he "lost focus of that . . . when they started showing as all of the pictures of all of these guys, and [he] just focused on the guys." [137] at 14. Defendants argue that this testimony is directly contradicted by the following testimony Hugo provided in the criminal proceeding: "Q: Could you tell us how many people were around you? A: There were a whole bunch of people. Q: Male or female? A: All males." [122-6] at 99-100. Hugo also testified that the person kicking him in the back was a "guy with a white coat," not a woman. [122-6] at 103.

The Court declines to apply the "sham affidavit" rule to bar Plaintiff's use of Hugo's deposition testimony in his response to the motion for summary judgment. Although the sham affidavit rule has been applied to parties and their own non-party witnesses, Hugo is not "one of [Plaintiff's] witnesses." *Adelman-Tremblay*, 859 F.2d at 521. Defendants have not identified, nor is the Court aware of, any cases in which the Seventh Circuit has applied the sham affidavit rule to disinterested witnesses, or to witnesses who are (or at least at one time were) aligned with the party who is seeking to take advantage of the rule. The Court agrees with the court's observation in *Newsome v. James*, 2000 WL 528475, at *2 (N.D. Ill. Apr. 26, 2000), that the

concerns underlying the rule—"that parties or witnesses aligned with them can defeat summary judgment on meritless claims by recanting prior sworn statements—is absent in the case of disinterested witnesses." Instead, "[v]ariations in the testimony of disinterested witnesses . . . raise questions about credibility" that are properly "answered by a jury, not by the Court." *Id*. (citing *Bank of Illinois*, 75 F.3d at 1170). In this case, Defendants do not argue that Hugo has any interest in Plaintiff prevailing in this suit, such that he might have had a motive to lie in his deposition to help Plaintiff defeat summary judgment. To the contrary, Hugo was himself a victim of the Amphitheater attacks and at the criminal trial he testified as a witness for the Government.

The Court also finds persuasive Judge Kennelly's reasoning in *Rodriguez v. Woodall*, 2004 WL 2583883 (N.D. Ill. Nov. 12, 2004), that it would be inappropriate to apply the sham affidavit rule to a *Brady* claim to "preclude the Court, on summary judgment, or a jury, at trial, from considering a prosecution witness's testimony that he was coerced or convinced by the police to lie." *Id*. at *4. Application of the rule in such a case could risk "immuniz[ing] from liability, or even scrutiny, dishonest law enforcement officers who coerce or otherwise fabricate evidence to frame an accused." *Id*. Given this risk, it is not surprising that Defendants have not cited, and the Court has not found, any cases in which the sham affidavit rule has been applied to bar a witness who testified in a criminal trial from later recanting his testimony. By contrast, Plaintiff cites to a number of cases in which *Brady* claims have been supported by statements from witnesses recanting their prior testimony. See [157] at 1-2; see also, e.g., *Whitlock v. Brueggemann*, 682 F.3d 567, 575-76 (7th Cir. 2012) (recognizing that, once admitted, statements of witnesses recanting their prior testimony that falsely implicated plaintiff in murder would preclude summary judgment for police defendants on plaintiff's *Brady* claim); *Taylor v. City of*

*Chicago*, 80 F. Supp. 3d 817, 821–22 (N.D. Ill. 2015) (denying motion to dismiss due process and *Brady* claims brought by plaintiff who was wrongfully convicted of murder and related crimes, where complaint alleged, among other things, that the defendant police officers framed plaintiff for the murder by coercing a witness to provide false incriminating testimony through threats and promises of leniency on unrelated charges and that the witness "later recant[ed] this statement").  For these reasons, the Court will consider Hugo's deposition testimony (except the portion in which he recounts what Denise allegedly told him after viewing the lineup) in ruling on Defendants' motion for summary judgment.

**Martha**—Martha testified that she never provided detectives with a facial, physical, or clothing description of her attackers.  [137] at 13.

**Powell**—Powell testified that he never told police that Plaintiff was involved in the attacks at the Amphitheater.  According to Powell, he "associated Patrick Hampton as somebody who I know who was at the concert who may or may not know Ricky Knight," [124-12] at 9, but that "all [he] said [to detectives] was Ricky Knight doing something," *id.* at 10.  He testified: "From the people I described were the only people I knew from my building.  If you notice, everybody I knew was from my building.  They took that and turned it around to be Ricky Knight's associates.  How they did that, I don't know.  But these were only supposed to be people that I identified whose names that I knew." *Id.* at 11.

Defendants argue that that Court should apply the sham affidavit rule to bar Plaintiff from using Powell's testimony to defeat summary judgment.  See *id*. at 18.  Although Powell's deposition testimony does contradict his testimony at the criminal trial that Plaintiff was one of the men who Powell saw going down the aisle at the Amphitheater with Ricky Knight making gang signs and chanting gang slogans, the Court declines to apply the "sham affidavit" rule to

Powell's deposition testimony. Powell, like Hugo, is a disinterested witness with no apparent incentive to lie to help Plaintiff defeat summary judgment. Indeed, Powell made clear at his deposition that he did not want to be involved in this lawsuit and wanted to "move on with [his] life." [157] at 4.

Powell further testified that he told the detectives the names of friends that he was with at the concert: Clinton Williams, Farod Poole, Lentin McGee, Freddie Fizer, and Kevin Powell (his older brother). These names are not contained in any CPD reports and Poole and Fizer were never questioned about the events at the Amphitheater.

**Duffin**—Duffin testified that as a matter of practice detectives would not want to show photos of the persons in custody to the victims or witness before the line-ups because it would influence their identification and "taint the lineup." [137] at 9-10. Duffin also testified that there can be "existential circumstances" that would permit the use of photo of a person in custody before a line up, such as when a victim is in the hospital and unable to view the line-up. [137] at 10. He further testified he understood in 1981 his duty to include exculpatory evidence in case reports.

Currently before the Court is Defendants' motion for summary judgment.

## II.    Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of

material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.   Analysis

### A.   Claims Against Duffin

#### 1.   Due Process

##### a.   Withholding of Exculpatory Evidence

To demonstrate a potential *Brady* violation based on the alleged withholding of potential exculpatory or impeachment evidence, "a defendant must point to specific evidence that was (1) favorable to the defense; (2) suppressed by the government; and (3) 'material to an issue at

trial.'" *United States v. Lawson*, 810 F.3d 1032, 1042 (7th Cir. 2016) (quoting *United States v. Shields,* 789 F.3d 733, 746 (7th Cir. 2015)).   Under the first prong, "[e]vidence is favorable to the defense when it is either exculpatory or could be used for purposes of impeachment." *Lawson*, 810 F.3d at 1042 (quoting *Kyles v. Whitley,* 514 U.S. 419, 433 (1995)).   Under the second prong, "[e]vidence is suppressed when 'the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'"  *Lawson*, 810 F.3d at 1043 (quoting *Shields,* 789 F.3d at 746–47).   "Although the Government has an affirmative duty to learn of and to disclose any favorable evidence, the defendant bears the burden of establishing a *Brady* violation by offering more than mere speculation or unsupported assertions that the Government suppressed evidence."  *Shields*, 789 F.3d at 747 (citing *United States v. Jumah,* 599 F.3d 799, 808–09 (7th Cir. 2010)). Under the third prong, for evidence to be considered material, "there must be 'a reasonable probability that the suppressed evidence would have produced a different verdict.'"  *United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014) (quoting *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)).

Plaintiff argues that Duffin violated his right to due process by withholding the following exculpatory or impeachment evidence from Plaintiff during the criminal trial: 1) notes from the detectives' interview with Powell; 2) notes from the detectives' initial interview with Martha; 3) Hugo's alleged statement to Duffin and Ptak that a female perpetrator kicked him in the back; 4) statements of the woman from Cicero and of witnesses who were too scared to intervene in the Amphitheater attacks, as reported in the Sun Times; 5) the "street file" for the investigation, as a whole; and 6) the unduly suggestive techniques that Duffin and Ptak used unsuccessfully with Hugo and that Ptak used successfully with Denise to obtain an identification of Plaintiff.  The

Court will consider each item of evidence in turn, and also will consider the cumulative effect of the alleged withholding of that evidence to determine whether Plaintiff's due process claim survives summary judgment. See *Kyles*, 514 U.S. at 421 ("the state's obligation under *Brady* . . . to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government").

### i.      Notes from Powell's interview

There is evidence that the notes from Powell's interview with Duffin and Ptak were suppressed, namely Ptak's admission at the suppression hearing in the criminal trial that he watched Duffin tear the notes in half and throw them away. There is also evidence that these notes may have contained information that was favorable to the defense. Powell testified at his deposition in this case that he told Duffin and Ptak only that he saw Plaintiff at the concert and that Plaintiff may have known Knight, but not that Plaintiff was one of Knight's associates or a participant in the attacks.

However, to the extent that the official report documenting Powell's statement to police was inaccurate—in particular the statement that Powell identified Plaintiff as an "offender" who was part of the group of "people [Powell] knew" who he saw participate in the Amphitheater attack—this was disclosed and fully explored during trial through Rodgon's "exercise of reasonable diligence." *Lawson*, 810 F.3d at 1043; cf. *Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011) ("A defendant in a criminal case that actually goes to trial has the 'responsibility to probe the witnesses and investigate their versions of the relevant events.'" (quoting *Carvajal v. Dominguez,* 542 F.3d 561, 567 (7th Cir. 2008))). Specifically, the transcript from the criminal trial shows that Rodgon elicited testimony from Powell acknowledging that he did not see Plaintiff participate in the physical attack of the victims or hear Plaintiff make any

admissions regarding the attack on the bus ride home.  See [136] at 10-11.  Judge Strayhorn nonetheless allowed the testimony to go in against Plaintiff on the theory of accountability because "[t]his is a group that [Powell] has identified the three Defendants as being a part of." [136] at 11.  Plaintiff does not challenge the correctness of this ruling or the use of the jury instruction on accountability, which provides that "[a] person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense."  [125] at 25.  The fact that the detectives' notes from their interview with Plaintiff were destroyed was also exposed at trial during the cross-examination of Duffin.

Indeed, Plaintiff acknowledges that "Defendants' tactics and misconduct with regard to Powell's identification were exposed, to a certain extent, during the trial" and therefore "standing alone, the fabricated Powell report would not likely constitute an actionable due process claim." [127-1] at 27.  Plaintiff argues, nonetheless, that this case is exceptional because Powell's identification gave the detectives justification to put Plaintiff in the photo array and line-ups, which witnesses used to implicate him.  But Plaintiff has offered no evidence that the detectives' alleged "fabrications" were necessary for the detectives to investigate Plaintiff.  In his more recent deposition, Powell acknowledged that he told the detectives that he saw Plaintiff at the event and he may be an associate of Knight, who Powell saw attacking the victims.  This alone would lead the detectives to investigate Plaintiff further.

### ii.    Notes from the initial interview with Martha

Plaintiff has not presented any evidence that there were notes taken during the detectives' initial interview with Martha or that such notes might contain exculpatory or impeachment

evidence that was not already included in the evidence that the Government turned over to Plaintiff's criminal attorney. The evidence suggests the opposite. At Plaintiff's criminal trial and in her deposition, Martha denied giving the detectives any physical description of her attackers, other than that they were black males, before she viewed Plaintiff's line-up. Plaintiff cannot avoid summary judgment on his due process claim based on "mere speculation [and] unsupported assertions" that exculpatory or impeachment evidence was suppressed. *Shields*, 789 F.3d at 747; see also *Jumah*, 599 F.3d at 811 ("unsupported assertions that the Government has suppressed evidence are insufficient to make out a *Brady* or *Giglio* violation").

### iii. Hugo's alleged statement regarding a female perpetrator

Plaintiff argues based on Hugo's 2013 deposition testimony that Duffin failed to disclose Hugo's alleged statement to Duffin and Ptak that a female perpetrator repeatedly kicked him in the back during the Amphitheater attack. The Court concludes that the impeachment value of Hugo's alleged statement is too speculative to support a *Brady* violation. Plaintiff argues that he could have used this evidence to impeach Denise's testimony concerning the identification of her attackers. But Hugo testified only that the female perpetrator was kicking *him* in the back during the attack, not that she was kicking or otherwise attacking Denise. Further, the undisputed evidence is that Denise was on the ground being attacked and sexually assaulted by several men while this was occurring. It is not plausible to expect her to have observed the gender of one of Hugo's assailants in the midst of her own violent attack.

### iv. Statements of the woman from Cicero and witnesses who were too scared to intervene

Plaintiff argues, based on information published in the Chicago Sun Times shortly after the Amphitheater attacks, that Duffin must have obtained and was required to disclose statements

from a woman in Cicero who filed a complaint about being robbed at the Amphitheater and from individuals who reportedly were witnesses to the attack but too scared to intervene. Plaintiff argues that "[t]he statements by these witnesses, any identifications that they made—or, more importantly for [Plaintiff], did not make—were *Brady* evidence that should have been turned over." [127-1] at 41. However, there is no testimony or evidence supporting Plaintiff's speculation that a statement by the woman from Cicero was given in the investigation or put in a street file, or that statements were even taken from other concertgoers mentioned in the articles.

Moreover, beyond arguing that those witnesses may not have identified Plaintiff, Plaintiff does not explain how this would demonstrate that he was not involved in the attack. There were hundreds, if not thousands, of people at the Amphitheater that night and dozens involved in the melee near the front of the stage. The Seventh Circuit has made clear that "a *Brady* violation does not arise due to nothing more than a possibility that the undisclosed item might have helped the defense," and that is all that Plaintiff has shown here. *United States v. Hamilton*, 107 F.3d 499, 510 (7th Cir. 1997); see also *Holland*, 643 F.3d at 256 ("The mere possibility that an item of evidence may have helped a defendant during his trial on criminal charges does not establish materiality.").

In addition, the existence of these other potential witnesses was public knowledge due to the Sun Times reports, and Plaintiff's counsel could through the exercise of reasonable diligence have sought discovery about these witnesses or impeached the detectives' investigation at trial on the basis that they did not explore potential leads with these witnesses. *Lawson*, 810 F.3d at 1043. While Plaintiff argues that Rodgon was diligent by asking for the "street files" for the case, they fail to offer any evidence that, once Rodgon was informed that there was no street file, he took any further steps to try to identify such witnesses, such as serving specific discovery on

the government or making an independent investigation. Indeed, the district court and Seventh Circuit both found in Plaintiff's habeas case that Rodgon provided ineffective assistance of counsel based on his failure to investigate and interview exculpatory witnesses. See *Hampton* 290 F. Supp. 2d 905, 922-23, *aff'd*, 347 F.3d 219.

### v.     The "street file" generally

Plaintiff argues that "the 'street file,' as a whole, contained exculpatory and impeachment evidence," including: "eyewitnesses who were or 'would have been' interviewed; alibi witnesses who would have been interviewed; named suspects in the attacks who would [have] been investigated; and leads that Detective Duffin testified would have been followed." [127-1] at 42. Plaintiff posits that if he had been provided access to the street file, it would have either: (1) "depict[ed] the kind of 'slovenly' investigation that is ample grounds for impeachment is a criminal case," or (2) revealed that "pertinent" information was destroyed by the detectives. [127-1].

Neither theory is persuasive. Plaintiff's counsel had an opportunity to explore the first theory during trial by cross-examining Duffin and Ptak about why their official reports contained no mention of interviewing alibi witnesses or following particular leads. As to the second theory, Plaintiff does not explain how any of these allegedly "undisclosed item[s] might have helped the defense," and therefore cannot survive summary judgment on his *Brady* claim. *Hamilton*, 107 F.3d at 510.

### vi.     Evidence of suggestive witness identification procedures

Plaintiff argues that Duffin violated his due process rights by withholding evidence concerning his and Ptak's alleged use of unduly suggestive identification techniques with Denise and Hugo. Plaintiff points to ASA McCarthy's memoranda detailing her interview with Denise

as evidence that Ptak used suggestive techniques to obtain Denise's initial identification of Plaintiff. In her deposition, ASA McCarthy testified that Denise told her that Ptak "ke[pt] taking [Plaintiff's] photo out and putting it back in and asking words to the effect of do you recognize him? Does this look like him? That type of thing." [124-12] at 26. McCarthy also testified that Denise said "Yes" when asked if "she felt pressured to identify" Plaintiff. *Id.* at 26. McCarthy further testified that Denise told her that her identification of Plaintiff in the subsequent line-up was based on her identification from the photo array, rather than from her own observation." *Id.*

Plaintiff also relies on Hugo's deposition testimony. Hugo testified that he viewed a photo array with Duffin and Ptak before seeing the line-up of suspects. See [124-11] at 16. According to Hugo, when he viewed the photos, Duffin and Ptak kept reinserting certain photos into the pile and referring back to them. Also according to Hugo, during the line-up the detectives kept coming back to certain numbers and asking questions like, "are you sure it wasn't three"? [137] at 8.

Assuming that Denise told McCarthy what the report claims she said, that evidence clearly would have been favorable to the defense in the criminal trial, satisfying the first *Brady* prong. The case against Plaintiff was solely based on identifications, not physical evidence, and as a victim, Denise's identification was likely given great weight by the jury. Hugo's testimony about Ptak and Duffin's alleged use of suggestive techniques with him is of less direct relevance and importance to the defense, because Hugo ultimately did not identify Plaintiff as one of his or Denise's attackers. However, evidence of the use of suggestive techniques with Hugo might have been "used for purposes of impeachment" more generally to call into question the detectives' techniques for making photo identifications. *Lawson*, 810 F.3d at 1042. Such evidence may also have been used by defense counsel to probe more deeply into Denise's

identification of Plaintiff and potentially obtain useful admissions. Therefore the Court concludes that, if disclosed, the "cumulative effect" of evidence that the detectives used the same suggestive technique with Denise and Hugo would have been favorable to the defense. *Kyles*, 514 U.S. at 421.

Under the second *Brady* prong, there is no question that evidence of the Detectives' alleged use of suggestive techniques was suppressed in the criminal prosecution. The Government did not disclose in any notes, documents, or testimony that Ptak or Duffin used suggestive techniques with Denise or Hugo in order to obtain an identification of Plaintiff. Further, the Government has not demonstrated that the Detectives' alleged use of suggestive techniques with Denise or Hugo was available to Plaintiff through the exercise of reasonable diligence or exposed during trial. *Lawson*, 810 F.3d at 1043. Although Plaintiff's criminal attorney moved to suppress the identifications and he and the other criminal defendants' attorneys questioned how the victims arrived at their identifications, if the victims were not fully truthful in their testimony, the Court cannot say that this evidence was reasonably available.

There is some evidence in the record suggesting that Denise and Hugo may not have been fully truthful and forthcoming in their testimony during the criminal prosecution. Denise's testimony at the suppression hearing might have led a listener to believe that Ptak simply handed her photos to look through, which she did until she identified Plaintiff and another suspect, without the listener comprehending that Ptak re-inserted the same photos back into the stack (which McCarthy reported Denise as saying). In response to questioning from one of Plaintiff's co-defendant's attorneys, Brownfield, Denise testified that Ptak "said to look at the pictures and see if I recognized anybody," [136-1] at 10, and that she looked at the photos "by hand," "one at a time" (rather than looking at all of the photos spread out on the table), *id*. at 12. Similarly,

Hugo testified at the suppression hearing that Duffin and Ptak handed him "[a] stack" of about twenty photographs to look through, that he went through them, and that he picked out Knight's photo and handed it to the officers. *Id.* at 108-110. Hugo only testified at his later deposition that Duffin and Ptak kept reinserting Plaintiff's photo into the stack and directing him to it. In addition, Denise testified at the suppression hearing (contrary to what she allegedly told McCarthy) that Ptak did not say anything to her during her viewing of the photo array.

The transcript of the suppression hearing also suggests that Judge Strayhorn limited Rodgon's attempts to further explore with Denise how the photo array was conducted. For instance, Judge Strayhorn sustained the government's objection to Rodgon's question, "How many pictures did you go through before you picked out the first person?" [136-1] at 23. More generally, Judge Strayhorn told Rodgon, "I'm not going to let you repeat the same thing Mr. Brownfield went over. She [Denise] said when Brownfield asked her the question, 'He gave me the pictures and asked me to look through them and see if I could identify anyone in them.'" *Id.* at 22.

Under these circumstances, the Court is unable to conclude that Rodgon could have, through the exercise of reasonable diligence, exposed Duffin or Ptak's alleged use of suggestive witness identification techniques with Denise or Hugo. *Lawson*, 810 F.3d at 1043. The Seventh Circuit "regard[s] as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). According to the court, "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses." *Id.* For instance, "a defense witness may be uncooperative or reluctant," or "the defense witness may have forgotten or inadvertently omitted some important piece of evidence

previously related to the prosecution or law enforcement." *Id.* These concerns have even more weight in a case, like this one, involving information possessed by a *prosecution* witness. The Court finds instructive the following observations from Judge Kennelly in *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 444–45 (N.D. Ill. 2011):

> Defendants' argument seems to assume the existence of a *Perry Mason*-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

Defendants contend that this case is more like *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 915 (N.D. Ill. 2015), in which the court dismissed a *Brady* claim in part based on a finding that the plaintiff could with reasonable diligence have obtained exculpatory testimony from his former co-defendants, since he knew that he and his co-defendants were innocent and the plaintiff "d[id] not allege that his co-defendants . . . were impossible for his defense counsel to interview or would have lied had Plaintiff questioned them." But this case is not like *Patrick*, because the evidence that was allegedly withheld was in the minds of the prosecution witnesses, not Plaintiff's former co-defendants, and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identification techniques with them. Therefore, drawing all "reasonable inferences in [Plaintiff's] favor as required on summary judgment, a reasonable jury could find that [Rodgon] could not have obtained the circumstances of [Denise and Hugo's witness identifications] through reasonable diligence." *Jimenez*, 830 F. Supp. 2d at 445.

The Court now turns to the third *Brady* prong. Viewing the evidence and drawing all inferences in favor of Plaintiff, a reasonable jury could conclude that the failure to disclose Ptak's and Duffin's alleged use of suggestive techniques was material. The key identifications of Plaintiff were made by Denise, Martha, and Henrichs. Plaintiff has raised a number of concerns about the accuracy of Martha's and Henrichs' identifications. When Martha viewed the line-up, she identified Plaintiff as one of the men who pulled her clothing off; only later at trial did she identify Plaintiff as the man who tried to put his hand in her vagina. Martha also blacked out for some time during the attack and told medical personnel following the attack that she did not know if she had been sexually assaulted. Martha also did not provide any testimony concerning what Plaintiff did to Denise or Hugo. Henrichs came forward as a witness only after police identified and contacted him, even though he was a security guard and Cook County Sheriff's Deputy. By the time Henrichs came forward, he had already seen Plaintiff and three of the other suspects on television and knew that they had been arrested and were in custody. One inference that could be drawn from these facts is that Henrichs crafted his testimony to fit with the narrative already being developed that Plaintiff was involved in the attacks. Given the arguable weakness of these identifications, a reasonable jury might find that the criminal jury would have acquitted Plaintiff if it had known about Ptak's use of suggestive identification techniques to obtain Denise's identification and Ptak's and Duffin's unsuccessful use of the same techniques with Hugo. *Morales*, 746 F.3d at 314.

### b. Use of Allegedly Unduly Suggestive Identification Techniques

"The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality." *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) (citing *Hensley v. Carey,* 818 F.2d 646, 648, 650 (7th Cir. 1987)). "It does,

however, guarantee the right to a fair trial[,] and that right is violated if unduly suggestive identification techniques are allowed to taint the trial." *Id.* Under Seventh Circuit precedent, "a 'witness's identification violates a defendant's right to due process when the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Lee v. Foster*, 750 F.3d 687, 691 (quoting *United States v. Recendiz,* 557 F.3d 511, 524 (7th Cir. 2009)).

The Court engages in a "two-pronged analysis" to determine whether an identification procedure reaches "this substantial threshold." *Lee*, 750 F.3d at 691. First, the Court determines whether the identification procedure was "suggestive and unnecessary." *Id.* (citing *United States v. Sandersi*, 708 F.3d 976, 983 (7th Cir. 2013)). According to the Seventh Circuit, "scientific sources should generally accompany an argument that a particular procedure was unnecessarily suggestive." *United States v. Sanders*, 708 F.3d 976, 985 (7th Cir. 2013). "Lawyers' assertions that the effects of a photo spread are 'clear' or 'obvious' are no substitute for evidence." *United States v. Acox*, 595 F.3d 729, 730 (7th Cir. 2010). Second, the Court determines "under the totality of the circumstances whether the procedure was nonetheless reliable." *Lee*, 750 F.3d at 691. "Both suggestiveness and reliability are evaluated by reference to the totality of the circumstances." *Alexander*, 433 F.3d at 555.

Ultimately, to prevail on his Section 1983 due process claim, Plaintiff must show that the use of unduly suggestive identification techniques "made his trial unfair." *Alexander*, 433 F.3d at 555. An illustrative list of the questions the Court may consider in making this determination include: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were

admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Id.*

Construing all facts and making all inferences in Plaintiff's favor, the Court concludes that there are disputed questions of material fact concerning whether the identification procedures that Ptak used with Denise were suggestive and unnecessary, and whether they were nonetheless reliable. *Lee*, 750 F.3d at 691. ASA McCarthy's report concerning her conversation with Denise supports Plaintiff's theory that Ptak's use of suggestive techniques caused Denise to identify Plaintiff when she otherwise would have been unable to do so. According to McCarthy, Denise admitted that Ptak suggested to her who to identify in the photo array by "taking [Plaintiff's] photo out and putting it back in and asking words to the effect of do you recognize him? Does this look like the guy?" [124-12] at 26. According to McCarthy, Denise admitted that her subsequent identification of Plaintiff in the line-up was "based on her identification from the photo array," rather than "on her own observations." *Id.* Further, according to McCarthy, Denise told her that she was "not sure" at the time she viewed the photo array "whether [Plaintiff] had actually done anything to her physically." *Id.* at 27.

Further, the Court concludes that there are disputed questions of fact concerning whether Ptak's use of suggestive techniques with Denise made Plaintiff's trial unfair, *Alexander*, 433 F.3d at 555, for the same reasons that the Court discussed above in concluding that the nondisclosure of Ptak's use of suggestive techniques with Denise may have been material to the outcome of Plaintiff's trial.

As to Ptak's and Duffin's alleged use of suggestive identification techniques with Hugo, there is no evidence that this made Plaintiff's trial unfair because Hugo did not identify Plaintiff as one of the perpetrators of the Amphitheater attacks.

Ptak is not a defendant in this case, and Duffin did not participate in Ptak's interview with Denise and therefore cannot be held directly liable for Ptak's alleged due process violation. The Court therefore must consider whether Duffin can be held liable for Ptak's alleged violation of Plaintiff's due process rights based on a theory of failure to intervene or conspiracy, to which the Court now turns.

### c. Duffin's Liability for Ptak's Alleged Violations of Plaintiff's Constitutional Rights

#### i. Failure to Intervene

In order to impose liability under Section 1983, "a plaintiff must establish a defendant's personal responsibility for any claimed deprivation of a constitutional right"; however, "a defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). "[I]n some circumstances, a state actor's failure to intervene in a violation of an another's constitutional rights can serve as a basis for § 1983 liability." *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 754 (N.D. Ill. 2012). In order to impose liability on a police officer for failure to intervene, the plaintiff must demonstrate that (1) a "'constitutional violation has been committed by a law enforcement official,'" and (2) the defendant "'had a realistic opportunity to intervene to prevent the harm from occurring.'" *Id.* (quoting *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994)).

In this case, the Court concludes that Duffin cannot be held liable for Ptak's use of suggestive identification techniques with Denise because Plaintiff has come forward with no competent evidence that Duffin had knowledge of Ptak's actions or a reasonable opportunity to intervene. Plaintiff's primary argument for inferring knowledge on Duffin's part is that Duffin and Ptak used the same suggestive techniques with Hugo the day before Ptak used them with Denise. Plaintiff cites to *Morfin v. City of E. Chicago*, 349 F.3d 989, 1001 (7th Cir. 2003), for

the proposition that Duffin should be held responsible for turning a "blind eye" to Ptak's actions. *Morfin*, unlike this case, involved a supervisor's responsibility for the actions of his subordinate officers. Duffin was not Ptak's supervisor. Moreover, in *Morfin*, the court recognized that in order to hold the police chief liable for constitutional violations of his officers, the plaintiff would have to show that the chief "had *knowledge* of facts that would cause him to believe" that his officers were going to act in an unconstitutional manner but "failed to use his authority to stop the violation." 349 F.3d at 1001 (emphasis added). As in *Morfin*, the Court does not believe that "the record, even when read in the light most favorable to [Plaintiff], can support a conclusion" that Duffin knew that Ptak was using improperly suggestive identification techniques in violation of Plaintiff's constitutional rights or that Duffin had any opportunity to intervene during Ptak's interaction with Denise. Therefore, Defendants are entitled to summary judgment on Plaintiff's claim for failure to intervene.

### ii.     Section 1983 Conspiracy

"Under Section 1983, a conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Moore v. Morales*, 445 F. Supp. 2d 1000, 1012 (N.D. Ill. 2006) (quoting *Scherer v. Balkema,* 840 F.2d 437, 441 (7th Cir. 1988)). To establish a prima facie case of conspiracy, a plaintiff must show (1) "'an express or implied agreement among defendants to deprive a plaintiff of his or her constitutional rights,'" and (2) "the 'actual deprivation of those rights in the form of overt acts in furtherance of the agreement.'" *Id.* (quoting *Scherer*, 840 F.2d at 442).

An agreement may be demonstrated by "establishing that the defendant officers 'underst[ood] the general objectives of the scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them.'" *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 913 (N.D. Ill. 2016) (quoting *McCann v. Mangialardi*, 337 F.3d 782, 789–90 (7th Cir. 2003)). A conspirator "need not have agreed on the details of the conspiratorial scheme," *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988), and can be held liable for conspiracy "'even though he was incapable of committing the substantive offense' himself," *Ocasio v. United States*, 136 S. Ct. 1423, 1430 (quoting *Salinas v. United States*, 522 U.S. 52, 64 (1997)). Further, "[b]ecause conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015).

In this case, Plaintiff points to the following evidence of an agreement between Duffin and Ptak to violate Plaintiff's right to due process by influencing victim identifications: (1) "Duffin worked with Ptak to use the very same suggestive techniques with Hugo as Ptak did with Denise in an investigation where they were jointly responsible," [127-1] at 35; (2) Duffin ripped up the notes from the Powell interview; (3) Duffin and Ptak wrote a false police report implicating Plaintiff as an offender and gang member; and (4) Duffin and Ptak were lead detectives responsible for the investigation of the Amphitheater attacks.

Taken as a whole, these facts are sufficient to allow Plaintiff's Section 1983 conspiracy claim against Duffin to survive summary judgment. Taking Plaintiff's version of the facts as true, Duffin and Ptak worked together using coercive techniques to attempt (without success) to get Hugo to identify Plaintiff as one of the perpetrators of the Amphitheater attacks. They did so only one day before Ptak allegedly used the same techniques (this time successfully) to persuade

Denise to identify Plaintiff as one of her attackers. Duffin and Ptak also allegedly (falsely) stated in their official report that Powell told them that he saw Plaintiff (and the rest of the group that Powell identified) participate in the Amphitheater attacks and heard Plaintiff (and the rest of the group that Powell identified) brag about the attacks on the bus ride home that night. Cf. *Jones*, 856 F.2d at 993 (evidence was sufficient to enable jury to infer that supervisory police officer approved of unlawful concealment of exculpatory evidence by subordinates to obtain conviction of defendant on charges of murder and rape, where supervisor signed a deceitful report for use by the prosecution); *Rainey v. City of Chicago*, 2013 WL 941968, at *10 (N.D. Ill. Mar. 11, 2013) (at summary judgment, plaintiff provided sufficient evidence of agreement among officers to conspire to cover up their use of excessive force against plaintiff by preparing police reports and misdemeanor complaints that contained allegedly "misleading, incomplete, and inaccurate information" to conceal the identities of officers). Duffin and Ptak then tore up their notes from their interview with Powell, which prevented Plaintiff's defense counsel from seeing any exculpatory evidence they might contain. Although the Court already found that the withholding of the Powell interview notes was not, by itself, sufficient to rise to the level of a due process violation, these acts may nonetheless serve as circumstantial evidence that Duffin and Ptak had an agreement to make sure that Plaintiff was identified as a suspect, regardless of the true facts developed during the investigation.

## 2. State Law Civil Conspiracy

Plaintiff's complaint also includes a claim against Duffin for civil conspiracy under Illinois law. Defendants argue that, pursuant to the Illinois Tort Immunity Act, Duffin cannot be held liable for any state law claims for an injury caused by the act or omission of another person, such as Ptak's use of unduly suggestive identification techniques with Denise or concealment of

the use of those techniques.  See [111] at 11 (citing 756 ILCS 10/2-204).  Plaintiff does not respond to this argument or Defendant's other arguments for summary judgment on Plaintiff's state law civil conspiracy claim.  Therefore, the Court concludes that Plaintiff has forfeited his claim for civil conspiracy and Defendants are entitled to summary judgment on this claim.  See, e.g., *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 924 (7th Cir. 2007) ("a party forfeits any argument it fails to raise in a brief opposing summary judgment" (citing *Witte v. Wis. Dep't of Corrs.*, 434 F.3d 1031, 1038 (7th Cir. 2006))); *Boogaard v. Natl. Hockey League*, 126 F. Supp. 3d 1010, 1026-27 (N.D. Ill. 2015) (personal representative of estate of former professional hockey player forfeited any argument that hybrid contract/duty-of-fair-representation claims were timely under applicable statute of limitations by failing to make such argument in either response brief or surreply brief).

### 3.     Malicious Prosecution

"In order to establish a claim of malicious prosecution, a plaintiff must demonstrate: (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages."  *Szczesniak v. CJC Auto Parts*, *Inc.*, 21 N.E.3d 486, 490 (Ill. App. 2015).

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for malicious prosecution because "Duffin had an objectively reasonable belief that Plaintiff robbed and sexually assaulted the victims as well as attempted to rape Denise."  [111] at 20.  Since they had probable cause to charge Plaintiff, Defendants argue, no malice can be inferred, either.

There must be probable cause for each criminal charge brought against a defendant.  See *Holmes v. Village of Hoffman Est.*, 511 F.3d 673 (7th Cir. 2007) (probable cause to believe an

individual committed one crime, and even his conviction of that crime, does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge).  As the Seventh Circuit has explained, "[i]n this respect, a malicious prosecution claim is treated differently from one for false arrest: whereas probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause, . . . probable cause as to one charge will nor bar a malicious prosecution claim based on a second, distinct charge as to which probable cause was lacking."  *Id*. at 682 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  "Probable cause is a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged."  *Fabiano v. City of Palos Hills,* 784 N.E.2d 258, 266 (Ill. App. 2002).  It is important to recognize that "there is a difference between evidence of the kind that negates proof beyond a reasonable doubt and that which is so significant as to undo the existence of probable cause."  *Purvis v. Oest*, 614 F.3d 713, 723 (7th Cir. 2010).  "[T]he evidence required to establish probable cause is considerably less than that required to sustain a criminal conviction."  *Id.* (citing *Braun v. Baldwin,* 346 F.3d 761, 766 (7th Cir. 2003).  Thus, there may have been probable cause to charge a defendant even when the defendant is acquitted.  See *id.* (officer had probable cause to arrest plaintiff, even though plaintiff was acquitted following a bench trial).  The existence of probable cause is "a complete defense to a malicious prosecution claim."  *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001).

The Court concludes that Defendants had probable cause to charge Defendant with all of the charges that went to trial: attempted rape, deviate sexual assault, robbery, and aggravated

battery of Denise; robbery and aggravated battery of Hugo; and attempted rape, robbery, and aggravated battery of Martha.

In evaluating whether there was probable cause of the charges brought against Plaintiff, it is necessary to keep in mind that the Government relied, and Judge Strayhorn allowed the case against Plaintiff to proceed, on a group theory of accountability. The jury was instructed that "[a] person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." [125] at 25. Plaintiff does not challenge this theory of accountability or Judge Strayhorn's use of this instruction. Thus, in order to charge Plaintiff, the Government did not need evidence that Plaintiff himself engaged in all of the crimes for which he was charged, so long as it had evidence that Plaintiff intended to promote or facilitate the commission of those crimes by other persons. Defendants have come forward with evidence—beyond the allegedly tainted identification of Plaintiff by Denise—that Plaintiff directly participated in the commission of at least some of the crimes for which he was charged, including the eyewitness identifications of Martha and Henrichs. "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

When Martha viewed a line-up on December 31, 1981, she identified Plaintiff as one of the offenders who pulled off her clothing. Plaintiff asserts that the officers should not have relied on Martha's identification because it was tainted by the use of unduly suggestive

identification techniques with the other victims. However, this is pure speculation, and therefore insufficient to show that the detectives should not have believed Martha. Martha viewed the line-up without viewing any photos, and (unlike Denise) there is no evidence that Martha's identification of Plaintiff was tainted in any way. Plaintiff also argues that the detectives should not have relied on Martha's identification because she admitted to blacking out for a time in the middle of the attack. Plaintiff does not explain, however, why it would have been impossible for Martha to see some of her attackers before she blacked out, at least to an extent sufficient to provide the Government with an "honest and sound suspicion" that Plaintiff was one of the men involved in the attack. *Fabiano*, 784 N.E.2d at 266.

In addition, when Henrichs viewed the photo array, he identified Plaintiff as the person he saw violating Denise with a foreign object. Plaintiff argues that Henrich's statement does not support a finding of probable cause because "ASA McCarthy did not consider his testimony to be reliable evidence on which to base a prosecution." [127-1] at 49. But this argument improperly conflates the standards for obtaining a conviction (beyond a reasonable doubt) with the much lower standard for charging a defendant (probable cause). The Court is also not convinced that "the totality of the circumstances calls the identification by . . . Henrichs into serious question" to such an extent that his identification could not form the basis for probable cause. [127-1] at 49. Plaintiff has come forward with no evidence that Henrich's statement was tainted by misconduct of the police. While Henrichs saw Plaintiff's photo on television before he identified Plaintiff in the photo array, there is no evidence that the television report contained the same level of detail that Henrichs provided in his alleged eye witness account. More specifically, Plaintiff has come forward with no evidence that Henrich could have known, except through personal observation, that one of the attackers put a foreign object into Denise's vagina.

Therefore, the Court concludes that Henrichs' statement, in conjunction with Martha's consistent statement, were sufficient to provide Defendants with probable cause to bring all the charges against Plaintiff.[6]

### 4. Intentional Infliction of Emotional Distress

Defendants argue that Duffin is entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress because Plaintiff failed to bring the claim within one year of his alleged injury, as required by 745 ILCS 10/8-101. Plaintiff offers no response to this argument, and therefore forfeits his claim for intentional infliction of emotional distress. See *Salas*, 493 F.3d at 924; *Boogaard*, 126 F. Supp. 3d at 1026-27.

### 5. Qualified Immunity

"'Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate *clearly established* statutory or constitutional rights that a reasonable person would know about.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). Once a defendant raises qualified immunity as a defense, "the plaintiff has the burden of establishing that his or her rights were violated and that the law concerning the proffered right 'was clearly established at the time the challenged conduct

---

[6] It is unnecessary for the Court to reach the last issue raised by the parties—whether the entry of an order of *nolle prosequi* is considered to be the termination of the criminal proceeding in Plaintiff's favor. The Court nonetheless notes that, under Illinois law, [f]or a *nolle prosequi* dismissal to satisfy the favorable termination element, '[t]he circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed *a lack of reasonable grounds to pursue the criminal prosecution*.'" *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 794 (N.D. Ill. 2013) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1243 (Ill. 1996)) (emphasis added); see also *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001). In this case, ASA McCarthy ultimately decided not to re-try Plaintiff based on her conclusion that the state would be unable to meet its burden of proof at trial, which would at least tend to suggest that the *nolle prosequi* dismissal in this case should qualify as a termination of the criminal proceeding in Plaintiff's favor.

occurred.'" *Id.* (quoting *Mustafa,* 442 F.3d at 548).  The Court must then determine "whether a reasonably competent official would know that the conduct was unlawful in the situation he confronted." *Mustafa*, 442 F.3d at 548.

"'In determining qualified immunity at the summary judgment stage, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation.'" *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 798 (7th Cir. 2016) (quoting *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013)).  In conducting the second step of this analysis, the Court's "first task is to consider controlling Supreme Court and Seventh Circuit precedent." *Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016).  Courts typically conduct this analysis "by focusing on the 'specific context in the case,' rather than on a 'broad general proposition.'" *Kristofek*, 832 F.3d at 798 (quoting *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004)).  Nonetheless, "general statements of the law are not inherently incapable of giving fair and clear warning, and in [certain] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); see also *Figgs v. Dawson*, 829 F.3d 895, 906 (7th Cir. 2016) ("While, to be clearly established, a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim, the very action in question need not have previously been held unlawful for a public official to have reasonable notice of the illegality of some action."  (internal citations and quotation marks omitted)).  In addition, "[w]hen allegations revolve around whether police officers failed to disclose *Brady* evidence, the qualified immunity question focuses on whether it was clearly established that the information that [the plaintiff]

contends the Defendants failed to disclose had to be turned over as exculpatory or impeaching."

*Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 743 (N.D. Ill. 2016) (citing *Carvajal*, 542 F.3d at 569).

As explained above, the Court has already determined that the facts, taken in the light most favorable to Plaintiff, make out a due process violation against Duffin based on his alleged conspiracy with Ptak to use suggestive techniques to obtain Denise's witness identification and the withholding of the use of suggestive techniques with Denise and Hugo from Plaintiff's criminal defense counsel. The next question is whether these alleged constitutional violations were clearly established at the time they occurred, in late 1981 and early 1982.

To determine whether qualified immunity applies to a conspiracy claim, the Court must determine "whether those who allegedly performed the acts in furtherance of the conspiracy are themselves shielded from liability for those acts." *Atkins v. Hasan*, 2015 WL 3862724, at *5 (N.D. Ill. June 22, 2015). In *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), *abrogated on other grounds by Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (U.S. 2017)—which Plaintiff cites but Defendants fail to address—the Seventh Circuit held that it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about . . . the conduct of a lineup." *Id.* at 752; see also *Newsome v. McCabe*, 319 F.3d 301, 302 (7th Cir. 2003) ("Two years ago we held that officers McCabe and McNally are not entitled to qualified immunity if, as Newsome alleges, they not only induced witnesses to accuse him falsely but also concealed their improper activities."); *Ott v. City of Milwaukee*, 48 F. Supp. 3d 1197, 1207 (E.D. Wis. 2014) ("*Newsome* held it was clearly established in 1979 and 1980 'that police could not withhold from prosecutors exculpatory information about . . . the conduct of a lineup.'" (quoting *Newsome*, 256 F.3d at 752)). Further, the Supreme Court recognized long before 1981 that "the

conduct of identification procedures may be 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law." *Foster v. California*, 394 U.S. 440, 442 (1969).

While *Newsome* and *Foster* involved a suspect line-up, rather than a photo array containing the suspect's photos, the Court concludes that *Newsome* was sufficiently on point to put a police officer on reasonable notice that it would violate due process to signal to a witness during the viewing of a photo array the identity of the suspected offender.

In addition, the Seventh Circuit also recognized before 1981 that "a conspiracy may be used as the legal mechanism through which to impose liability on each and all the defendants without regard to the person doing the particular act." *Hostrop v. Bd. of Jr. College Dist. No. 515, Cook and Will Ctys. and State of Ill.*, 523 F.2d 569, 576 (7th Cir. 1975). Defendants argue, nonetheless, that Duffin is entitled to qualified immunity because he was "entitled to rely upon information furnished to him by other officers"—specifically, information provided by Ptak regarding Denise's identification of Plaintiff—pursuant to the theory of "collective knowledge." [136] at 33. The cases cited by Defendants, however, require an officer's reliance on information obtained from another officer to be "objectively reasonable" and "in good faith." See *Wilbon v. Plovanich*, 67 F. Supp. 3d 927, 940 (N.D. Ill. 2014) ("In a civil case for an arrest without probable cause, the collective knowledge doctrine means a defendant is entitled to qualified immunity if he relied in objective good faith on another officer as to the justification for the arrest." (internal citation and quotation marks omitted)); *Bibart v. Stachowiak*, 888 F. Supp. 864, 867 (N.D. Ill. 1995) (arresting officers who reasonably relied upon information obtained from another law enforcement official regarding outstanding arrest warrant are entitled to qualified immunity from suit if it subsequently appears that information that arresting officers

received was erroneous); *Hardiman v. Ford*, 41 F.3d 1510, 1994 WL 585409, at *2 (7th Cir. Oct. 25, 1994) (explaining that "[s]o long as the officer's reliance on the 'collective knowledge' is objectively reasonable, he will be accorded qualified immunity" from suit arising from arrest without probable cause). Construing the facts in the light most favorable to Plaintiff, Ptak and Duffin may have engaged in a conspiracy to identify Plaintiff as a suspect regardless of what the evidence actually showed, in which case it was not objectively reasonable, or in good faith, for Duffin to rely on any statements that Ptak made concerning Denise's identification of Plaintiff in the photo array and line-up. Therefore, the Court concludes that Duffin is not entitled to the protections of qualified immunity.

**B.    Claims Against The City**

**1.    *Monell***

Pursuant to *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658 (1978), "[a] local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010). Under this standard, "[t]he governmental body's policies must be the *moving* force behind the constitutional violation before we can impose liability." *Id*. at 306. In addition, "[i]f the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations." *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015).

Plaintiff's *Monell* claim is based on the City's alleged widespread practice of withholding exculpatory materials contained in "street files" in felony criminal investigations during the time period involved in Plaintiff's criminal prosecution, 1981 to 1982. Plaintiff argues that the City should incur *Monell* liability based on Duffin and Ptak's alleged failure to disclose that they used improperly suggestive identification techniques when showing the photo array to Denise. However, Plaintiff has offered no evidence that the City's practice of withholding street files was the driving force behind that alleged constitutional violation.

As an initial matter, Plaintiff has not offered any evidence, beyond speculation, that a street file existed for Plaintiff's criminal case. More to the point, Plaintiff does not argue or offer any evidence that suggestive techniques used in a photo array would be the type of "evidence" that one would expect to be included in the street file, if one did exist. Indeed, Plaintiff states in his supplemental brief, [157] at 21, that he is "not proceed[ing] on a *Monell* theory for a widespread practice of suggestive witness identification techniques and has not submitted that evidence here." Instead, Plaintiff points to four other types of evidence that, he argues, would have been in the street file: (1) a witness statement from the woman from Cicero; (2) notes from Powell's interview; (3) Hugo's description of a female offender; and (4) Martha's initial witness statement. The closest Plaintiff comes to asserting a link between the withholding of information concerning the use of suggestive techniques and his injury is his argument that "[t]he evidence supports a finding that, since [CPD] authorized and condoned detectives to withhold exculpatory *witness statements*, the Detectives also felt unfettered to also withhold the information of how they obtained the false identifications." [127-1] at 65 (emphasis added). This is insufficient to establish causation under this Circuit's case law, which Plaintiff fails to discuss. There must be "a direct causal connection between the policy or practice and [the plaintiff's] injury." *Rice ex*

*rel. Rice v. Correctional Med. Services*, 675 F.3d 650, 675 (7th Cir. 2012). And while the Seventh Circuit has not "adopt[ed] any bright-line rules defining a 'widespread custom or practice,'" the plaintiff "must demonstrate that there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303; see also *Williams v. Heavener*, 217 F.3d 529, 532 (7th Cir. 2000) ("Ordinarily, one incident is not sufficient to establish a custom that can give rise to *Monell* liability."). Without any evidence that the City has a widespread practice of failing to disclose its use of unduly suggestive techniques with witnesses, Plaintiff cannot show that Defendants' alleged withholding of suggestive techniques in this case was anything more than a "random event." *Id.* Therefore, Plaintiff cannot establish a causal link between his injuries and the city's policies or practices and the City is entitled to summary judgment on Plaintiff's *Monell* claim.

### 2.      Respondeat Superior

Defendants' motion for summary judgment does not address Plaintiff's respondeat superior claim. Plaintiff argues only that, "[u]nder respondeat superior, the City may also [li]able for [Ptak's] actions, within the scope of his employment, in the malicious prosecution claim." [127-1] at 24, n.2. Since Defendants are entitled to summary judgment on the malicious prosecution claim for the reasons explained above, the Court concludes that the City is also entitled to summary judgment on Plaintiff's claim for respondeat superior.

### 3.      Indemnification

None of the parties address Plaintiff's indemnification claim in their summary judgment briefs. In his complaint, Plaintiff states that "Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities." [1] at 18. Since the Court is allowing Plaintiff

to proceed on his Section 1983 due process claim—a constitutional tort—against Duffin, the Court concludes that the City is not entitled to summary judgment on Plaintiff's claim for indemnification. See generally 745 ILCS 10/9-102; *Grayson*, 157 F. Supp. 3d at 748 (Section 1983 judgment qualifies as "tort judgment" within meaning of Illinois' indemnification statute so long as employee was acting within scope of his employment).

## IV. Conclusion

For the reasons explained above, the Court grants in part and denies in part Defendants' motion for summary judgment [104]. The Court enters summary judgment in favor of Defendants and against Plaintiff on Plaintiff's *Monell* claim against the City of Chicago for violation of his right to Due Process (Count I) and on Plaintiff's claims for Failure to Intervene (Count II), Malicious Prosecution (Count IV), Intentional Infliction of Emotional Distress (Count V), Civil Conspiracy (Count VI), and Respondeat Superior (Count VII). Defendants' motion for summary judgment is denied as to Plaintiff's Section 1983 claim against Defendant Duffin for violation of Plaintiff's right to Due Process (Count I), Plaintiff's Section 1983 claim for Conspiracy (Count III), and Plaintiff's claim for Indemnification (Count VIII). This case is set for status hearing on July 26, 2017 at 9:30 a.m.

Dated: July 13, 2017

_____
Robert M. Dow, Jr.
United States District Judge